Golden SUNKETT; Lloyd Henderson; Theo Primas; Calvin L. Fisher, Jr.; Lisa Roberts Taylor; and Carolyn Clarke, Plaintiffs,

v.

John A. MISCI, Jr.; Marc Riondino; Steven Buividas; Milton Milan; The City of Camden; Dennis Kille, Camden City Attorney; and Gwendolyn Faison, Mayor, City of Camden, Defendants.

Civil Action No. 99–5371.

United States District Court,
D. New Jersey.

Jan. 24, 2002.

Gregg L. Zeff, Mark B. Frost, Frost & Zeff, Marlton, NJ, for Plaintiffs, Golden Sunkett, Lloyd Henderson, Theo Primas, Calvin L. Fisher, Jr., Lisa Roberts Taylor, and Carolyn Clarke.

Mike D. Jones, Charles A. Ercole, Klehr, Harrison, Harvey, Branzburg & El-lers LLP, Cherry Hill, NJ, for Defendants, John A. Misci, Jr., Marc Riondino, Steven Buividas, and Milton Milan.

Rocky L. Peterson, Dakar R. Ross, Susan E. Inverso, Hill Wallack, Princeton, NJ, for Defendants, City of Camden, Dennis Kille, Camden City Attorney, and Gwendolyn Faison, Mayor, City of Camden.

OPINION

ORLOFSKY, District Judge.

## TABLE OF CONTENTS

I. INTRODUCTION ...................................................699

II. FACTS AND PROCEDURAL HISTORY.....................................699
 A. Calvin Fisher .........................................699
 B. Golden Sunkett ........................................701
 C. Lloyd Henderson.......................................701
 D. Theo Primas ..........................................701
 E. Lisa Roberts Taylor ..................................702
 F. Carolyn Clarke .......................................702
 G. Procedural History ...................................703

III. DISCUSSION ....................................................704
 A. Summary Judgment Standard ............................704
 B. The Rule 37 Motion ...................................704
 C. Facially Defective or Unsupported Claims .............705
 1. Section 1985 .....................................705
 2. Due Process ......................................706
 3. Title VII and ADEA ...............................706
 4. "Direct" Discrimination...........................707
 D. Retaliation Under the United States and New Jersey Constitutions ...........708
 1. Calvin Fisher ....................................708
 a. Liability .....................................710
 2. Golden Sunkett....................................711
 3. Lloyd Henderson ..................................713
 4. Theo Primas ......................................713
 5. Lisa Roberts Taylor ..............................714
 6. Carolyn Clarke ...................................715
 E. CEPA .................................................715
 F. NJLAD Retaliation.....................................717
 G. Race Discrimination ..................................718
 1. Differential Treatment ...........................718
 2. Harassment/Hostile Work Environment Claims........719
 H. Section 1985—Conspiracy to Discriminate ..............721
 I. ADEA Discrimination—Primas and Sunkett ...............721
 J. Due Process Liberty Interest—Fisher ..................721
 K. Civil Conspiracy .....................................722

IV. CONCLUSION .....................................................723

## I. INTRODUCTION

This case is a cautionary tale for local governments everywhere. The Plaintiffs, who are or were employed as attorneys for the City of Camden, New Jersey, allege that paranoia, corruption, and cronyism in the operations of the City Attorney's Office during the administration of the former mayor, Milton Milan, caused some of them to lose their jobs, and others to lose pay. Since the Plaintiffs are attorneys, many of them well-versed in the laws of workplace discrimination, the differential treatment they identify has also inspired them to allege violations of a wide range of federal and state laws and constitutional provisions outlawing discrimination in its varying forms. Because I ultimately conclude that the evidence of cronyism and political maneuvering is far more substantial than the evidence of racism, I will allow the bulk of the Plaintiffs' claims under the First Amendment, and under New Jersey law protecting employees against retaliation for speech that serves the public interest, to proceed to trial. At the same time, I must dismiss the Plaintiffs' allegations of racism as unsubstantiated on the present record. Many of the Plaintiffs' other claims must also be dismissed, due to an assortment of technical legal shortcomings.

Thus, for the reasons set forth more fully below, I will DENY the Defendants' Motion to Strike, pursuant to Fed.R.Civ.P. 37(c), and GRANT IN PART and DENY IN PART the Defendants' Motions for Summary Judgment.

## II. FACTS AND PROCEDURAL HISTORY

Milton Milan ("Milan") became the Mayor of the City of Camden, New Jersey, in July of 1997. He had been in office for just over four months, when, in December of that year, he installed John A. Misci, Jr. ("Misci") as the City Attorney. Misci, in turn, promoted Marc Riondino ("Riondino") to serve as the First Assistant City Attorney. Milan's term as Mayor ultimately ended in December of 2000, following his December 21, 2000 conviction on 14 counts of federal fraud, structuring, and money laundering charges. On June 15, 2001, United States District Judge Joel A. Pisano sentenced Milan to a term of imprisonment of 87 months.

The Plaintiffs in this case are African–American attorneys who were, at varying times during the Milan administration, Assistant City Attorneys for the City of Camden. Since the events forming the basis for the various Plaintiffs' claims are quite diverse, I will set forth each set of facts separately for each Plaintiff.

### A. Calvin Fisher

Calvin Fisher ("Fisher") was already an Assistant City Attorney at the time Milan became Mayor. Fisher's duties included defending the City of Camden ("the City") against tort claims, as well as representing its interests in foreclosure and bankruptcy proceedings.

Fisher represented the City in its efforts to collect a tax lien against a property, 1300 Admiral Wilson Boulevard, known locally as "the Sears Building." The City's lien was very substantial, eventually exceeding $800,000. In 1996, title to the Sears Building was acquired by Boulevard Management and Maintenance Corporation and its principal, Marc Willis ("Willis"), in exchange for a small sum and assumption of the property's tax liability. Willis then allowed Milan to use the Sears Building as his campaign headquarters during the mayoral election, free of charge. Pls.' Exh. 5 ¶¶ 5–6. By late 1997, the back taxes on the property had still

not been paid, and the City placed the Sears Building on its "foreclosure list," the final administrative step prior to actual foreclosure. Pls.'s Exh. 19 at 34–35.

Diane Hood ("Hood"), the Tax Collector for the City of Camden, was responsible for maintaining the foreclosure list. Hood often consulted with Fisher before listing a property, in order to make sure that the premises were not the subject of a bankruptcy proceeding. Shortly after Misci took office, according to Fisher, Hood told him that Riondino had asked her to remove the Sears Building from the foreclosure list. Pls.' Exh. 8 at 147. Fisher's response was to share with Riondino, both orally and in writing, his opinion that the property could not, and should not, be removed from the list. Id. at 148.

What Fisher did not know was that, in March of 1998, according to Willis, Milan had approached Willis with a "deal" to avoid foreclosure. In exchange for the City's forbearance, Willis would pay the City $100,000, and Milan would personally receive a kickback of $35,000. Pls.' Exh. 5 ¶¶ 17–21. Willis refused to accept Milan's "deal." During March and April of 1998, Willis claims, he was contacted by, and spoke several times with, Riondino about the "deal" for the Sears property. Id. ¶¶ 23, 29–31. Willis also claims that he told Riondino about the kickback. Id. ¶ 30.

In May of 1998, Fisher met with Misci and Riondino to review the City's outstanding liens against the Sears Building. Pls.' Exh. 8 at 332–33. At the meeting, Fisher complained that the City would lose money if the foreclosure on the Sears Building did not proceed, and he demanded to know "what's going on with this thing?" Id. at 333. When Misci and Riondino responded with an explanation that they were trying to reduce the overall tax obligation on the building, Fisher argued

that there was "no way" they would be able to do it. Id. at 333–34. Fisher also claims that, during the meeting, Riondino told him "I'm going to do everything I can on this, but I'm not going to jail for that guy." Id.

Fisher was also assigned, at least initially, to represent the City in a contract claim, *VSP v. City of Camden* ("the VSP matter"). According to Fisher, he assigned the case to another attorney in the Tort Claims Unit, Emil Nell ("Nell"). Pls.' Exh. 8 at 130–31, 247. Nell, however, apparently never undertook any action, as the City of Camden never filed an Answer to the Complaint in the VSP matter, with the result that in late 1996 a default was entered against the City. In January of 1998, the City was served with a Writ of Execution in the amount of $219,000. Fisher claims that on January 17, 1998, he had a conversation with Misci about the VSP matter, in which he explained to Misci what was happening, including the fact that Fisher was engaged in ongoing settlement negotiations with the plaintiffs. Pls.' Exh. 8 at 113–14. Fisher also avers that the two had another conversation about VSP in April of 1998. Id. at 141. Fisher moved to vacate the default judgment on July 8, 1998.

On July 27, 1998, Fisher apprised Misci of the fact that his motion to vacate the City's default had been denied. The pair exchanged several memos over the next few days about the VSP matter. On July 31, Misci met with Milan to discuss Misci's intention to fire Fisher. Milan agreed with Misci that Fisher should be fired. Indiv. Defs.' R. 56.1 Statement ¶¶ 80–81. That afternoon, Misci and Riondino met with Fisher to ask for his resignation, which Fisher tendered shortly thereafter. Fisher was replaced by a pair of young, female, African–American attorneys.

According to Willis, there was a brief epilogue to Fisher's termination. After the institution of this suit, in late 1999 or early 2000, Misci and Riondino requested a meeting with Willis. Pls.' Exh. 5 ¶ 35. At the rendezvous, Misci and Riondino, explaining that "they needed to justify the termination of Fisher," asked Willis for "dirt" on Fisher's dealings with the Sears Building bankruptcy. *Id.* ¶¶ 40–42.

### B. Golden Sunkett

Golden Sunkett ("Sunkett") was hired by the City in April of 1997 to work in Camden's Tort Claims Unit. Although Sunkett received two raises in 1998, Pls.' Exh. 47, he did not receive any salary increase in 1999. In fact, the only attorneys to receive raises of any kind in 1999, Steven Buividas ("Buividas") and Marc Riondino, were both white. *Id.*

During the Milan administration, Sunkett, at various times not disclosed in the summary judgment record, occasionally made comments that were arguably critical of the operations of the City Attorney's office. In one instance, Sunkett described as "really nutty" an apparent effort by Misci and Riondino to aid Buividas in avoiding a trial date in state court by inserting Buividas, mid-trial, as second chair in a proceeding before this Court. Pls.' Exh. 12 at 64. On another occasion, Sunkett gave a wide-ranging, distinctly negative appraisal of the City Attorney's Office to members of the New Jersey State Financial Review Board. *Id.* at 136–38. Although Sunkett himself did not identify any particular complaints that he made directly to Misci and Riondino about the level of staffing and support in the office, another attorney testified at her deposition that he "made no bones about speaking up against the short staffing in our office" and "unfair treatment." Pls.' Exh. 9A at 133.

On December 30, 1999, Sunkett had a heated confrontation with Riondino over Riondino's directive that Sunkett transfer one of his cases to Buividas. *Id.* at 129; Pls.' Exhs. 50–52. Misci memorialized the exchange in a memo to Milan, in which he highlighted Sunkett's "resistance to the policy and managerial decisions of the City Attorney's Office" and his use of "profanity laced language." Pls.' Exh. 50. Sunkett is still employed as an Assistant City Attorney.

### C. Lloyd Henderson

Lloyd Henderson ("Henderson") worked as an Assistant City Attorney for the City of Camden from July, 1994, until his resignation in September of 1999. Pls.' Exh. 47. Like Sunkett, Henderson received two raises in 1998, but no raises in 1999. *Id.*

Beginning with his very first meeting with Misci, shortly after Misci took over as City Attorney, Henderson complained often about the fact that the attorneys in the office needed more support. Pls.' Exh. 11 at 153–54. At staff meetings, Henderson claims, he continued on this theme, noting his view that more staffing and case support were necessary. *Id.* at 155.

On at least two other occasions, Henderson noted potential conflicts of interest for the City Attorney's office, and recommended the retention of outside counsel. *Id.* at 187, Pls.' Exhs. 71–75.

### D. Theo Primas

Theo Primas ("Primas") began working for the Camden City Attorney's office in 1984. By the beginning of Misci's tenure, Primas was the Senior Assistant City Attorney—that is, the non-appointed staff attorney with the greatest seniority. When Milan appointed Misci as City Attorney, Kille—then the Acting City Attorney—returned to the ranks of the staff attorneys,

displacing Primas. Primas received two raises in 1998, but none in 1999. Pls.' Exh. 47.

Like many of the other Plaintiffs, Primas was unhappy with the daily operations of the City Attorney's Office. Primas noted that he was not given recognition for legitimate achievements, Pls.' Exh. 2 at 136, and that he was subject to petty harassment he believed was calculated to humiliate him, such as the re-requisitioning of his chair to Buividas. *Id.* at 130. Primas began speaking, confidentially, to Preston Taylor ("Taylor"), the City's Business Administrator, about what he perceived to be "favoritism" and "harassment" in the City Attorney's Office. *Id.* at 139–140. On the day Fisher resigned, Primas complained again to Taylor, as well as to Keith Walker, the Assistant Business Administrator, and two members of the Camden City Council. *Id.* at 141–42. When Taylor heard that Fisher was going to be fired, he "stormed into" the mayor's office, angrily decrying Fisher's firing to Misci and Milan. Pls.' Exh. 30 at 27–33. Taylor later told Primas that, during his meeting with Misci and Milan, Taylor had disclosed that Primas was the source of some of the complaints of unfair treatment. Pls.' Exh. 2 at 147.

### E. Lisa Roberts Taylor

Lisa Roberts Taylor ("Roberts Taylor") has been employed as an Assistant City Attorney since 1989. A major portion of Roberts Taylor's workload is contract administration.

In March of 1998, Roberts Taylor claims, she was invited to a private meeting with Mayor Milan, in which he offered her more power and responsibility if she would be part of his "team." Pls.' Exh. 9A at 76–78. Roberts Taylor was given a merit raise that year, on top of the cost of living adjustment awarded to all of the staff attorneys. *See* Pls.' Exh. 47, 66–67. Roberts Taylor believed this was a result of her conversation with Milan. Pls.' Exh. 9A at 79.

In the ensuing months, according to Roberts Taylor, Misci and Riondino asked her to assist in the execution of several contracts that were, in her view, illegal. On each occasion, Roberts Taylor balked. For example, Roberts Taylor warned Misci and Riondino that the City's decision to double the amount of money that was to be paid to a public contract bid-winner would violate the local 20% increase cap. *Id.* at 148–49. In a municipal grant decision, Roberts Taylor objected to a proposed award of public moneys to a private charter school. *Id.* at 153. Roberts Taylor also argued that a third outlay, for construction of a city roller rink, would have to be publicly bid, or risk "skirting the bidding laws." *Id.* at 153–54. In yet another public contract, this time for street cleaning, Roberts Taylor objected that the contract could not lawfully be processed without obtaining state approval. *Id.* at 156–57. She was overruled. *Id.*

Roberts Taylor claims that, after a few of her rejections and complaints, Misci and Milan began to feel that she was not really "on their team," after all. She found herself no longer welcome at the informal gatherings in Misci's office, where she had formerly dropped by for "small talk" with Misci, Riondino, and Buividas. *Id.* at 163. In 1999, Roberts Taylor received no raise of any kind. *Id.;* Pls.' Exh. 47.

### F. Carolyn Clarke

Carolyn Clarke ("Clarke") was hired by Misci as an Assistant City Attorney in August of 1998. She resigned about six months later, in February, 1999. During her brief tenure at the City Attorney's office, Clarke primarily assisted in cases assigned to Buividas. Clarke was also as-

signed to process tort claims, apparently a duty often carried out by paralegal assistants. On a handful of occasions, she was also asked to retrieve books and make phone calls, requests that she resented as beneath her perceived station.

Discontent with her role as second fiddle to Buividas, Clarke complained to Misci about her work assignments. When no changes were in the offing, Clarke resigned.

### G. Procedural History

On November 17, 1999, the Plaintiffs filed a Complaint in this Court alleging violations of their rights to free speech and equal protection under the Constitutions of the United States and New Jersey, and seeking damages and reinstatement, where appropriate. Plaintiffs also filed, in approximately the same time period, a Charge with the United States Equal Employment Opportunity Commission ("EEOC") alleging violations of their rights under Title VII, 42 U.S.C. § 2000e. On March 23, 2000, they each received a Right to Sue Letter from the EEOC. Accordingly, on May 26, 2000, they amended their Complaint to add claims under both Title VII and the Age Discrimination in Employment Act, 29 U.S.C. §§ 621–34.[1]

After the Defendants moved to dismiss in part, pursuant to Fed.R.Civ.P. 12(b)(6), the Amended Complaint, on January 22, 2001, I issued an unpublished Opinion and Order, granting in part and denying in part the Defendants' motion. *See Sunkett v. Misci*, No. 99–5371, slip op. at 3 (D.N.J. Jan. 22, 2001). More particularly, I dismissed the Plaintiffs' claims alleging violations of their due process right to property under the Fourteenth Amendment, their claims alleging a violation of public policy under New Jersey law, their claims for

defamation, and their freestanding claim for attorney's fees and punitive damages. I also dismissed as untimely the claims by Plaintiff, Calvin L. Fisher, under the New Jersey Conscientious Employee Protection Act, N.J. Stat. Ann. §§ 34:19–1 to –8 ("CEPA"), but permitted the remaining Plaintiffs to amend their Complaint to allege more particularly, if the facts allowed, a violation of that statute.

On three occasions, April 24, 2000, October 4, 2000, and November 8, 2000, respectively, the Plaintiffs moved to compel compliance with their discovery requests. Magistrate Judge Rosen granted all three motions, and, in an Order dated February 2, 2001, awarded partial fees and costs incident to the Defendants' non-compliance.

With leave of the Court, Plaintiffs filed a Second Amended Complaint on February 15, 2001. The Second Amended Complaint deleted the dismissed counts, and added somewhat more particularized allegations of CEPA violations. On July 31, 2001, the Defendants filed these motions for summary judgment. Included in the Plaintiffs' Response to the motions was an affidavit of one Mark Willis. *See* Pls.' Exh. 5. The Defendants, claiming that Willis' testimony unfairly surprised them, moved to strike it under Fed.R.Civ.P. 37. Discovery was also reopened for the limited purpose of deposing Willis, which Defendants did on July 24, 2001.

As the city officer defendants have been sued in their official as well as individual capacities, the present holders of the relevant city offices, Dennis Kille, the new City Attorney, and Gwendolyn Faison, the current Mayor, have been substituted pursuant to Fed.R.Civ.P. 25(d).

---

**1.** Although the Plaintiffs amended their Complaint to add claims under the ADEA, their Right to Sue Letters referred only to Title VII. *See* Am. Compl. Exh. A.

I have jurisdiction over the Plaintiffs' federal claims pursuant to 28 U.S.C. §§ 1331 and 1343, and supplemental jurisdiction over their state and common law claims pursuant to 28 U.S.C. § 1367.

## III. DISCUSSION

### A. Summary Judgment Standard

A party seeking summary judgment must "show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c); *see also Nebraska v. Wyoming,* 507 U.S. 584, 590, 113 S.Ct. 1689, 123 L.Ed.2d 317 (1993); *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Abramson v. William Paterson Coll. of N.J.,* 260 F.3d 265, 276 (3d Cir.2001); *Doe v. County of Centre,* 242 F.3d 437, 446 (3d Cir.2001). In deciding whether there is a disputed issue of material fact, the Court must view the underlying facts and draw all reasonable inferences in favor of the non-moving party. *See, e.g., Abramson,* 260 F.3d at 276 (citing *Farrell v. Planters Lifesavers Co.,* 206 F.3d 271, 278 (3d Cir.2000)); *Shields v. Zuccarini,* 254 F.3d 476, 481 (3d Cir.2001)(citing *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)).

Under the rule, a movant must be awarded summary judgment on all properly supported issues identified in its motion, except those for which the non-moving party has provided admissible evidence or affidavits to show that a question of material fact remains. *See, e.g., Gleason v. Norwest Mortgage, Inc.,* 243 F.3d 130, 138 (3d Cir.2001)(citing *Becton Dickinson & Co. v. Wolckenhauer,* 215 F.3d 340, 343 (3d Cir.2000)). The non-moving party must provide "sufficient evidence to allow a factfinder to find in its favor at trial." *Id.* at 138.

### B. The Rule 37 Motion

■ The Defendants, as noted, have moved to strike the Affidavit of Mark Willis, *see* Pls.' Exh. 5, for failure to comply with the terms of Fed.R.Civ.P. 26. Specifically, the Defendants argue that the Plaintiffs never disclosed to them the fact that Willis possessed information relevant to the Plaintiffs' allegations of racial discrimination, with the result that they elected not to depose Willis. The record supports Defendants' contention that, even in their most detailed descriptions of Willis' expected testimony, Plaintiffs made no specific disclosure of Willis' knowledge of evidence of discrimination. *See* Ercole Cert. Exh. I.

■ Rule 37 requires exclusion where a party has "without substantial justification" failed to make required disclosure, and the failure is not "harmless." Fed. R.Civ.P. 37(c)(1). In determining whether or not evidence should be excluded under Rule 37, I must consider: "(1) the prejudice or surprise in fact of the party against whom the excluded witnesses would have testified; (2) the ability of that party to cure the prejudice; (3) the extent to which waiver of the rule ... would disrupt the orderly and efficient trial of the case or other cases in the court; and (4) bad faith or wilfulness in failing to comply with the district court's order." *Konstantopoulos v. Westvaco Corp.,* 112 F.3d 710, 719 (3d Cir.1997).

The balance of these factors clearly weighs against excluding any portion of Willis's testimony. Certainly, the Defendants cannot claim to be surprised about Willis's testimony, aside from the revelations about the use of racial epithets by some of the Defendants. At least two previous deponents gave testimony suggesting that Willis had knowledge highly relevant to the Plaintiffs' claims of retalia-

tion. *See, e.g.,* Pls.' R. 37 Br. Exh. I at 75–79; Pls.' Exh. 8 at 331. Nor will the Defendants suffer any prejudice from the admission of Willis's testimony about the racial epithets. As I explain, *infra,* these isolated, non-contemporaneous remarks, even if fully credited, are scarcely probative of any intent on the part of Misci, Milan, or Riondino to discriminate based upon race. Defendants were given an opportunity to cure any prejudice by deposing Willis, and did in fact depose him. There was no undue delay or other disruption of the proceedings. Nor is there any evidence of bad faith or wilfulness. Accordingly, I shall deny the Defendants' Motion to Strike.

## C. Facially Defective or Unsupported Claims

Each of the six Plaintiffs has alleged approximately twelve distinct claims, alleged against all five named defendants, for a grand total of about 360 different possible combinations of Plaintiff, claim, and Defendant. Needless to say, this array of Plaintiffs, claims, and Defendants has presented the Court with certain organizational problems. In an effort to make this thicket of claims somewhat more manageable, I will first address issues common to all of the Plaintiffs.

### 1. Section 1985

■ The Plaintiffs allege that the Defendants conspired to commit acts violative of various federal and state constitutional and statutory rights protecting the Plaintiffs and their conduct. *See* 2d Am. Compl. at ¶¶ 229–237. That conspiracy, Plaintiffs allege, itself violates 42 U.S.C. § 1985.[2] *Id.* ¶ 237. At the outset, many of the Plaintiffs' allegations must go by the wayside, as § 1985(3) protects only rights

guaranteed by the United States Constitution. *See Brown v. Philip Morris,* 250 F.3d 789, 805 (3d Cir.2001). The more difficult question is whether § 1985(3) can extend to Plaintiffs' allegation that the Defendants conspired to retaliate against them for exercising their First Amendment rights.

■ In order to state a claim under § 1985(3), a plaintiff must allege: "(1) a conspiracy; (2) motivated by a racial or class based discriminatory animus designed to deprive, directly or indirectly, any person or class of persons to the equal protection of the laws; (3) an act in furtherance of the conspiracy; and (4) an injury to person or property or the deprivation of any right or privilege of a citizen of the United States." *Lake v. Arnold,* 112 F.3d 682, 685 (3d Cir.1997) (citing *United B'hd of Carpenters & Joiners of Am., Local 610 v. Scott,* 463 U.S. 825, 828–29, 103 S.Ct. 3352, 77 L.Ed.2d 1049 (1983); *Griffin v. Breckenridge,* 403 U.S. 88, 102–03, 91 S.Ct. 1790, 29 L.Ed.2d 338 (1971)). Noting the dangers that, if given coverage as broad as its language, § 1985 could become, in effect, a general tort statute, the Supreme Court has never recognized any expansion of the "motivated by racial or class based discriminatory animus" prong beyond race. *See Bray v. Alexandria Women's Health Clinic,* 506 U.S. 263, 269, 113 S.Ct. 753, 122 L.Ed.2d 34 (1993). In *Bray,* the Court rejected a contention that the group of persons who favored or were seeking an abortion could constitute a class. "Whatever may be the precise meaning of a 'class' for purposes of ... § 1985(3) ... the term unquestionably connotes something more than a group of individuals who share a desire to engage in conduct that the § 1985(3) defendant disfa-

**2.** Since the facts alleged by Plaintiffs would contravene only 42 U.S.C. § 1985(3), I assume that they intended to plead that section specifically.

vors." *Id.* While the Court has not explicitly ruled out political affiliation as a protected class, it has expressed very serious reservations on that score. *See Scott,* 463 U.S. at 836, 103 S.Ct. 3352. Read on the whole, the Supreme Court's opinions, and the Third Circuit cases interpreting them, seem to demand that a § 1985(3) defendant have discriminated on the basis of relatively immutable, highly identifiable, and discrete group identification, such as race, gender, disabled status, or perhaps religion.

The Plaintiffs' allegations of a retaliatory conspiracy clearly fail to meet this standard. Even if § 1985(3) could conceivably cover some violations of the First Amendment—religious discrimination, most notably—the facts in the summary judgment record do not even suggest that the Plaintiffs belong to a widely identifiable class. Rather, the Plaintiffs belong to a class of persons who spoke critically of the Defendants. That would seem to fall within, or at least within the shadow of, the Court's admonition in *Bray* that a class must constitute "something more than a group of individuals who share a desire to engage in conduct that the § 1985(3) defendant disfavors." *Bray,* 506 U.S. at 269, 113 S.Ct. 753. I will grant the Defendants' Motions for Summary Judgment on the § 1985(3) counts, except for that portion of those claims based on racial discrimination.

## 2. Due Process

■ The Plaintiffs have alleged that Misci, Riondino, Buividas, and Milan (collectively, "the individual defendants") deprived them of their liberty interest in their professional reputation, in violation of the Due Process Clause of the Fourteenth Amendment. *See* 2d Am. Compl. ¶¶ 216–

22. In order to make out a Fourteenth Amendment liberty interest, a plaintiff must show that he or she was stigmatized by information related to his discharge, which was published or otherwise disseminated by the employer to the public. *See Anderson v. City of Philadelphia,* 845 F.2d 1216, 1221–22 (3d Cir.1988). With the exception of Fisher, none of the Plaintiffs has pointed to any evidence in the summary judgment record establishing that stigmatizing information about them was "published or otherwise disseminated" by the individual defendants. Accordingly, I must grant summary judgment on these claims.

## 3. Title VII and ADEA

The Plaintiffs each allege that the City of Camden discriminated against them on the basis of race, in violation of Title VII, and Plaintiffs, Sunkett and Primas, further allege that the City discriminated against them on the basis of age. Title VII and ADEA plaintiffs may not seek relief or redress in federal court for any claim that has not first been presented to the EEOC. *See* 42 U.S.C. §§ 2000e–5(b), (f); 29 U.S.C. §§ 626(c), (d); *Alexander v. Gardner–Denver Co.,* 415 U.S. 36, 47, 94 S.Ct. 1011, 39 L.Ed.2d 147 (1974); *Seredinski v. Clifton Precision Prods. Co.,* 776 F.2d 56, 61 (3d Cir.1985). "The purpose of requiring exhaustion is to afford the EEOC the opportunity to settle disputes through conference, conciliation, and persuasion...." *Antol v. Perry,* 82 F.3d 1291, 1296 (3d Cir. 1996). I have serious reservations whether the spirit of the exhaustion requirement is satisfied by filing a charge with the EEOC *after* initiating a federal lawsuit alleging identical violations under different provisions of federal law.[3] Additionally,

---

**3.** Although Title VII's procedural requirements are more stringent than, say, suits under § 1983, the standard for employer—i.e.,

deep-pocket—liability is much more forgiving under Title VII than under § 1983. Yet under the Plaintiffs' approach, public employees

the Plaintiffs did not receive a Right to Sue Letter on their ADEA claims. The Plaintiffs' failure is not necessarily a bar to this suit, so long as the ADEA claims bear a "reasonable relation" to those charges actually raised before the EEOC. *See Robinson v. Dalton,* 107 F.3d 1018, 1026 (3d Cir.1997) (citing *Waiters v. Parsons,* 729 F.2d 233, 235 (3d Cir.1984) (*per curiam* )).

Since, however, I ultimately find that the Plaintiffs' Title VII and ADEA claims are without merit, I need not decide these procedural questions.

### 4. "Direct" Discrimination

■ The Plaintiffs argue, correctly, that they may meet their burden of production through direct evidence that the Defendants' actions were motivated by racial animus. *See* Pls.' Br. at 79–80; *Walden v. Georgia–Pacific Corp.,* 126 F.3d 506, 512 (3d Cir.1997), *cert. denied,* 523 U.S. 1074, 118 S.Ct. 1516, 140 L.Ed.2d 669 (1998). "Direct" evidence of discrimination allows a Plaintiff to avoid the burden-shifting framework of *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), and shift the entire burden of production and persuasion onto the defendant to show that it would have taken the disputed action regardless of the demonstrated discriminatory motive. *See Walden,* 126 F.3d at 512–13. The Plaintiffs, however, have an unusual view of the meaning of "direct." [4] A statement is direct evidence of discrimination when it is made by a decisionmaker with regard to the exact decision at issue. *See id.* at 513; *see also Price Waterhouse v. Hopkins,* 490 U.S. 228, 277, 109 S.Ct. 1775, 104 L.Ed.2d

268 (1989) (O'Connor, J., concurring) ("What is required is . . . direct evidence that decisionmakers place substantial negative reliance on an illegitimate criterion in reaching their decision."). In other words, direct evidence is a statement by Employer X, "I am firing Employee Z because she is black," or circumstantial evidence to the same effect. "Stray remarks, especially when temporally remote from the discriminatory incident, do not meet this standard." *Price Waterhouse,* 490 U.S. at 277, 109 S.Ct. 1775 (O'Connor, J., concurring); *see also Armbruster v. Unisys Corp.,* 32 F.3d 768, 779 (3d Cir.1994).

■ None of the evidence offered by the Plaintiffs even approaches this standard. According to Willis, Misci, Milan, and Riondino each once used a racial epithet. *See* Pls.' Exh. 5 ¶¶ 40, 57. However offensive, these are classic "stray remarks," and all were remote in time from the incidents alleged in the Second Amended Complaint. Plaintiffs also point to an alleged statement by Misci that he was going to "change the color of the office." Pls.' Br. at 80. There is no admissible evidence in the summary judgment record that Misci ever made such a statement. Although Plaintiffs attempt to characterize Dennis Turner's testimony, relating to conversations he overheard between the Defendants, as evidencing "derogatory racial comments," a more accurate description would be that he overheard negative comments about other attorneys in the office, whom he knew to be black. *See* Pls.' Exh. 31 at 95–97.

The other incidents adduced by the Plaintiffs, although perhaps indicating ra-

could file suit immediately and amend later, thus eventually gaining all the advantages of Title VII while minimizing the procedural hurdles. In my view, Title VII was not intended to give that unique advantage to public employees.

4. For example, the Plaintiffs contend that the fact that Dennis Turner, an African–American legal assistant, carried out "janitorial duties," is direct evidence of the fact that Fisher was fired because he, too, was African–American. See Pls.' Br. at 82.

cial insensitivity, do not demonstrate any actual animus. For example, Plaintiffs note that Buividas told Clarke he thought she was single, since a number of other black mothers he had met were also unmarried. *See* Pls.' Exh. 15 at 55–56. On another occasion, Riondino asked Roberts Taylor to approach the Camden Fire Chief, who was African–American, for an affidavit, because Riondino felt the Chief would relate better to Roberts Taylor. Pls.' Exh. 9A at 83–85. These incidents do not shed any direct light on the Defendants' hiring practices.

Accordingly, I conclude that the Plaintiffs have failed to make a sufficient showing of "direct evidence" of discrimination to avoid the need for a *McDonnell Douglas*, "pretext" analysis.

## D. Retaliation Under the United States and New Jersey Constitutions

■ The Plaintiffs allege that the Defendants violated their rights to free speech under the First Amendment to the United States Constitution, and under Article I ¶ 6 of the New Jersey Constitution, by retaliating against them for a variety of statements made by the Plaintiffs. Except in certain doctrinal areas not relevant here, the protections of Article I ¶ 6 of the New Jersey Constitution mirror those of the First Amendment, and the New Jersey Supreme Court relies on federal constitutional principles in interpreting its own constitution's free speech provisions. *See Hamilton Amusement Center v. Verniero*, 156 N.J. 254, 264–65, 716 A.2d 1137, 1141–42 (1998), *cert. denied*, 527 U.S. 1021, 119 S.Ct. 2365, 144 L.Ed.2d 770 (1999).

■ The Plaintiffs' free speech rights are somewhat circumscribed as a result of their status as public employees. Public employees may sue to enforce the constitutional protection of their speech if:

"(1) they spoke on a matter of public concern; (2) their interest in that field outweighs the government's concern with the effective and efficient fulfillment of its responsibilities to the public; (3) the speech caused the retaliation; and (4) the adverse employment decisions would not have occurred but for the speech." *Fogarty v. Boles*, 121 F.3d 886, 888 (3d Cir.1997). In order to survive summary judgment, a plaintiff need only show that "a trier of fact could find that plaintiffs' protected conduct played a substantial role" in causing the retaliatory acts. *Suppan v. Dadonna*, 203 F.3d 228, 237 (3d Cir.2000). In other words, the plaintiff does not need to establish element four, but-for causation, until trial. *See id.* at 236. It is the court's duty to determine whether an issue is a matter of public concern, and whether the plaintiff's interest in expression outweighs the government's intent in limiting it. *See Green v. Philadelphia Hous. Auth.*, 105 F.3d 882, 887–88 (3d Cir.) (citing *Connick v. Myers*, 461 U.S. 138, 150 & n. 10, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983)), *cert. denied*, 522 U.S. 816, 118 S.Ct. 64, 139 L.Ed.2d 26 (1997). Finally, in order for the retaliatory conduct to be actionable under § 1983, it must have been "sufficient 'to deter a person of ordinary firmness' from exercising his First Amendment rights." *Suppan*, 203 F.3d at 235 (quoting *Bart v. Telford*, 677 F.2d 622, 625 (7th Cir.1982)).

### 1. Calvin Fisher

■ Fisher points to two principal incidents that, in his opinion, motivated his retaliatory discharge. More precisely, he claims that his repeated criticism of the decision to remove the Sears Building from the City's foreclosure list, as well as his disagreement with the City's decision to settle the *Horta* lawsuit despite the fact that it was fraudulent, both were at least

substantial causes for his termination. I conclude that a reasonable jury could agree on the first ground but, as there is no evidence in the summary judgment record that any of the Defendants ever learned about Fisher's views on the *Horta* suit, could not agree on the second.

Fisher's views on the Sears Building foreclosure are plainly matters of public concern. Fisher believed that removing the Sears Building from the foreclosure list, and/or dramatically reducing the amount of back taxes due, would cost the City of Camden a substantial amount of money. *See* Pls.' Exh. 8 at 157–58. The City was under pressure from the State of New Jersey to foreclose on properties and reduce its deficit shortfall. *See id.* at 144. Perhaps most significantly, Fisher believed there was "no valid reason" to remove the Sears property from the foreclosure list, *id.* at 150–51, and that the scheme proposed by Riondino was "illegal." *Id.* at 158. These concerns are "squarely within the core public speech delineated in *Connick.*" *Czurlanis v. Albanese,* 721 F.2d 98, 104 (3d Cir.1983). The Defendants have not offered, and I cannot imagine independently, any legitimate governmental interest in suppressing or regulating Fisher's speech on this issue.

■ The evidence, taken in a light most favorable to Fisher, also supports a conclusion that his speech played a substantial role in his termination. Fisher made his concerns clear to both Riondino and Misci in May of 1998. *See* Pls.' Exh. 8 at 148, 155, 332–34. Misci had the power to fire Fisher, although as a practical matter his power was perhaps subject to the Mayor's approval. *See* Indiv. Def.'s R. 56.1 Statement ¶¶ 80–81. He did so, after consultations with both Riondino and Milan. *Id.* ¶¶ 79, 81. A temporal remove of just a few months between a supervisor's awareness of the employee's protected activity and the retaliatory acts, along with other facts suggestive of a retaliatory intent, can be sufficient to support an inference of causation. *See Farrell v. Planters Lifesavers Co.,* 206 F.3d 271, 279–81 (3d Cir.2000). The fact that Fisher was, in effect, accusing Misci, Milan, and Riondino, the very men who fired him, of illegal activities, supports an inference that they were motivated to retaliate against him, especially in light of Riondino's alleged statement that he wouldn't be willing to "go[ ] to jail for that guy." Pls.' Exh. 8 at 333–34. Finally, the Willis affidavit, in which Willis reports that Misci and Riondino were actively searching for justifications for firing Fisher, can support a reasonable inference that there was not, in fact, a true legitimate reason. *See* Pls.' Exh. 5 ¶¶ 40, 42.

Furthermore, accepting, as I must, Fisher's testimony, the reasons suggested by the Defendants for his firing are more likely than not a pretext for retaliation. The Defendants argue that Fisher was discharged for subjecting the City to a default judgment in excess of $200,000 in the VSP matter. *See* Indiv. Def.'s Repl. Br. at 3–4. According to Fisher, however, Misci was aware of the default by January of 1998. Pls.' Exh. 8 at 113. Assuming that claim is true, it is difficult to understand why Misci would have waited until July to demand an explanation and fire Fisher, unless the default was only a pretext. In light of the facts outlined in the preceding paragraph, Fisher has easily met his burden to show that the VSP default was merely a pretext for retaliation.

■ Fisher also argues that his disagreement with the City Attorney's decision to settle one of his cases was a basis for his firing. However, the summary judgment record contains no evidence that he ever voiced this disagreement to anyone

other than "Lisa," or that Lisa ever told anyone else. Pls.' Exh. 8 at 329. Therefore, Fisher cannot show a causal relation between his opinions about the settlement and his firing, and so I must grant summary judgment on this portion of his retaliation claim.

### a. Liability

■ Although Fisher has carried his burden on the essential elements of his claim, I must still grant summary judgment to any defendant against whom Fisher cannot properly establish liability under § 1983, which serves as the vehicle for his First Amendment claim.[5] I have previously determined that supervisory officials acting under color of state law may only be sued in their individual capacities under § 1983 where the individual defendant is "personally involved in the alleged wrongs." *Santiago v. City of Vineland*, 107 F.Supp.2d 512, 540 (D.N.J.2000) (citing *Rode v. Dellarciprete*, 845 F.2d 1195, 1207 (3d Cir.1988)). "Personal knowledge can be shown through allegations of personal direction or of actual knowledge and acquiescence." *Id.*

■ Although the evidence in the summary judgment record plainly supports the personal involvement of Misci and Riondino in Fisher's firing, the case against Milan is somewhat more tenuous. While the individual Defendants themselves admit that Milan consented to the Fisher layoff, *see* Indiv. Def.'s R. 56.1 Statement ¶¶ 80–81, that is not the same thing as Milan having personal involvement in the "alleged wrongs." If Milan was merely a dupe, misled by Misci into thinking that there was good cause to fire Fisher, then he can hardly be said to have been personally involved in "wrongs." Based on this record, however, I conclude that there is sufficient evidence for a reasonable jury to find that Milan at the very least knew of the retaliatory reason for Fisher's firing and acquiesced in it. There is evidence to suggest that the scheme to remove the Sears Building from the foreclosure list was initiated by Milan. *See* Pls.' Exh. 5 at ¶¶ 20–21. The scheme may have involved illegal kickbacks to Milan. *Id.* It is reasonable to conclude that Milan would have closely monitored the execution of the "deal," and been wary of people, like Fisher, who seemed suspicious of the "deal" and eager to delve into the details. Misci and Riondino would likely have been aware of, and possibly shared, this concern, especially considering that, according to Willis, Riondino knew of the kickback. *Id.* ¶ 30. It is plausible, then, that they would have told the Mayor about Fisher's objections, and that he at least knew of, if not agreed with, the retaliatory purposes for Fisher's termination.

■ This brings me to the City's liability. There is no *respondeat superior* liability under § 1983; municipal defendants, although "persons" within the meaning of the statute, are liable only when the underlying violation of federal law results from an official policy or custom of the municipal entity. *See Bd. of County Comm'rs v. Brown*, 520 U.S. 397,

---

**5.** The New Jersey Supreme Court has not definitively established a standard for supervisor or employer liability in retaliation claims arising under the New Jersey Constitution. Although New Jersey relies on general principles of agency to resolve liability for conceptually similar claims under CEPA, *see* III.E., *infra*, it might be possible that the New Jersey Supreme Court would elect something resembling the more demanding § 1983 standard for constitutional claims. *See Bd. of County Comm'rs v. Brown*, 520 U.S. 397, 403, 117 S.Ct. 1382, 137 L.Ed.2d 626 (1997). Since I conclude that all four possible defendants in Fisher's Art. I ¶ 6 claim would be liable even under *Brown*, I need not decide which standard would be the more likely choice for New Jersey.

403, 117 S.Ct. 1382, 137 L.Ed.2d 626 (1997); *Merkle v. Upper Dublin Sch. Dist.,* 211 F.3d 782, 791 (3d Cir.2000) (citing *Monell v. Dep't of Social Servs.,* 436 U.S. 658, 690–91, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978)). Section 1983 plaintiffs can establish a "policy or custom," among other methods, by identifying "a single decision by a final policymaker." *Santiago,* 107 F.Supp.2d at 539 (D.N.J.2000) (citing *Pembaur v. City of Cincinnati,* 475 U.S. 469, 480, 106 S.Ct. 1292, 89 L.Ed.2d 452 (1986)). A final policymaker is that official who possesses " 'final, unreviewable discretion to make a decision or take an action.' " *Id.* (quoting *Bielevicz v. Dubinon,* 915 F.2d 845, 850 (3d Cir.1990)). Identification of the final policymaker is a question of law for the court to decide. *See Simmons v. City of Philadelphia,* 947 F.2d 1042, 1062 (3d Cir.1991) (citing *Jett v. Dallas Indep. Sch. Dist.,* 491 U.S. 701, 109 S.Ct. 2702, 105 L.Ed.2d 598 (1989)).

There is no serious contention that either Misci or the Mayor lacked final, unreviewable authority to fire Fisher. As I have determined that, on the summary judgment record, a reasonable juror could conclude that both made a decision to fire Fisher for retaliatory purposes, it follows that the City of Camden also is liable.

Accordingly, I must deny the Defendants' motion for summary judgment on the portion of Fisher's free speech claim based on the Sears Building incident.

### 2. Golden Sunkett

██ In support of his free speech claim, Sunkett points to comments he made concerning the mid-trial assignment of Buividas to him as second chair, as well as his remarks to the New Jersey State Financial Review Board. *See* Pls.' Br. at 60–61, Pls.' Exh. 12 at 64, 137. Both of these conversations are protected speech, but there is no evidence of a causal rela-

tion between the discussion with the Review Board and any adverse action against Sunkett.

██ The Buividas assignment, according to Sunkett, came in the middle of a trial before this Court in a matter described in the record only as *Knight. Id.* at 63. Again according to Sunkett, subsequent events suggested to him that Buividas was sent, not in order to assist Sunkett, but in order to help Buividas to avoid trial in a state matter for which he was unprepared. Thus, Buividas, with the apparent assistance of Misci and Riondino, was making a misrepresentation to the judge in the state proceeding. The integrity of public officers, and public tribunals, is a matter of public concern. *See Baldassare v. New Jersey,* 250 F.3d 188, 195 (3d Cir.2001) (citing *Holder v. City of Allentown,* 987 F.2d 188, 195 (3d Cir.1993)). Nor have the Defendants come forward with any governmental interest that might justify thwarting Sunkett's views, and any such justification is beyond this Court's imagination, as well.

Establishing a causal link between Sunkett's speech and any sufficiently adverse action against him is more troublesome, however. Sunkett complained to Misci and Riondino about the assignment, essentially accusing them of complicity in the misdeed. *See* Pls.' Exh. 12 at 64–65. While the summary judgment record does not disclose the date of the incident, it was, presumably, prior to the filing of this suit in November of 1999. Additionally, Sunkett made a series of other complaints about Buividas, some of a similar character, which a reasonable juror could infer stretched over a period of time. See Pls.' Exh. 12 at 49, 52–53, 79–80. Even so, it is Sunkett's burden to demonstrate that his protected activity preceded the retaliatory acts. I cannot say that he has met this burden with regard to his allegations that

he was denied credit for winning some cases, and that some of his other cases, not identified by name, were transferred, in retaliation for his speech. *See* 2d Am. Compl. ¶ ¶ 129, 140–41.[6] Similarly, although Sunkett alleges that he was subjected to a hostile work environment, he cites no specific incidents in support of this claim. While Sunkett argues that he was denied staffing support that was available to Buividas, *see* Pls.' Exh. 12 at 90, the uncontested evidence is that secretarial assignments were not carried out by Misci or Riondino. *See* Pls.' Exh. 4 at 86–89.

A more plausible argument is Sunkett's claim that his failure to receive a salary increase in 1999 was substantially caused by Misci's desire to retaliate against him.[7] Salaries for the Assistant City Attorneys could be increased upon Misci's request, subject to approval by the Mayor and City Business Administrator. *See* Pls.' Exh. 4 at 51–53. The employment records for the Assistant City Attorneys reflect the fact that even so-called "cost of living increases" were granted based on the request of the City Attorney. *See* Pls.' Exh. 47. Thus, Sunkett's raise was within Misci's control. Although, again, the exact temporal relation of the various events is difficult to assess, given the state of the summary judgment record, it appears likely that Sunkett's complaints occurred a fair amount of time after Buividas's hiring in March of 1998, and before the end of 1999. Thus, Sunkett's complaints, and the absence of his raise, were relatively close in time. The justifications offered by the Defendants for Sunkett's

wage stasis, tight budgets and job performance, are implausible, given that Buividas received a raise in 1999, *see* Pls.' Exh. 48, there was a budget surplus in the City Attorney's office for 1999, *see* Pls.' Exh. 85 at 43, and the obvious fact that cost-of-living increases, by definition, are not related to job performance. Considering the fact that Sunkett's complaints implicated Misci in ethically questionable behavior, as well as Buividas, Sunkett has established a prima facie case of retaliation, and a reasonable juror could find that the Defendants' reasons for the denial of Sunkett's wage increase were a pretext for discrimination.[8]

This leaves, again, the question of liability for each Defendant. The summary judgment record does not contain any evidence that Riondino or Buividas had any role in salary increases. While Milan may have been required to approve any proposed increase, there is no evidence that he was aware of a retaliatory motive for denying a requested increase, or indeed that he was even aware of any such request. As for the City of Camden, it appears possible that Misci's authority was final if he elected not to recommend a raise. That is, although Misci needed the approval of the Mayor and Business Administrator to increase an employee's wages, it is a fair inference from the notation "upon recommendation of the City Attorney" on all of the assistant's documented raises, Pls.' Exh. 47, that he may have been able to single-handedly deny raises, simply by declining to recommend them. Thus, there is a disputed issue of

---

**6.** While the summary judgment record might, conceivably, reveal the names and dates of these incidents, when counsel elects not to include record citations in their arguments, they must run the risk that the Court will not be able to verify their allegations, and my own search of the record reveals no such evidence.

**7.** Roberts Taylor requested a wage increase on behalf of all of the Assistant City Attorneys for 1999. See Pls.' Exh. 65.

**8.** Sunkett offers no evidence that his comments to the Review Board were known to anyone but the Review Board.

material fact underlying the possible responsibility of the City for Misci's refusal to grant a raise to Sunkett.

Accordingly, I must grant summary judgment to Riondino, Milan, and Buividas on Sunkett's free speech claims, but deny summary judgment to Misci and the City of Camden.

### 3. Lloyd Henderson

■ For substantiation of his free speech claims, Henderson points to his comments and memos reflecting his belief that the City of Camden had potential conflicts of interest in several cases. *See* Pls.' Br. at 57; Pls.' Exh. 11 at 187–88; Pls.' Exhs. 71–75. While the Rules of Professional Conduct are important to the practice of law, routine substitutions of counsel, by themselves, are not matters of public importance. Rather, they are simply "internal office affairs" of the kind identified by the Supreme Court as outside of the public interest. *Connick v. Myers,* 461 U.S. 138, 149, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983). Henderson attempts to elevate the importance of his comments about the *Horta* matter by alluding to events surrounding the ultimate disposition of the case, presumably some time after he recommended outside counsel. *See* Pls.' Br. at 58. That contention is not supported by the summary judgment record. The record reveals only that Henderson "commented" that the City should consider outside counsel in *Horta*—not that he spoke about any actual misfeasance or wrongdoing. *See* Pls.' Exh. 11 at 187–88. Thus, I must grant the Defendants' Motion for Summary Judgment on Henderson's free speech claim.

### 4. Theo Primas

■ Primas's free speech claims are based on his vigorous disagreement with the decision to fire Fisher, as well as more general complaints about the atmosphere of the City Attorney's Office. The summary judgment record discloses a causal connection to any possible retaliatory acts only for the former.

On the day that Fisher resigned, Primas went to talk with Taylor, the City's Business Administrator. Pls.' Exh. 2 at 141. Primas told Taylor that the staff believed the firing was not merited and not fair. *Id.* Taylor, infuriated, "stormed into" Milan's office, where he confronted Misci and the Mayor about the termination. Pls.' Exh. 30 at 28–33.

Primas has successfully established a prima facie case of retaliation for his complaints about the Fisher termination. Since I have concluded that a reasonable fact finder could conclude that Fisher's firing was contrary to law, *see* III.D.1., *supra,* and Primas alleges that he thought as much at the time, I conclude that Primas's speech concerned possible governmental misfeasance, and was therefore a matter of public concern. Primas also claims that, on the Monday following the Friday of Primas's talk with Taylor, Misci approached him and accused him of having gone to Taylor with "problems with Calvin being let go." Pls.' Exh. 2 at 142. It is a reasonable inference from this conversation that Taylor had revealed that Primas had come to him about Fisher.[9] In contrast, there is no evidence in the summary judgment record that any of Primas's more general complaints about the office, whether to Taylor or to the City Council, ever got back to the Defendants. Further,

9. Primas also testified that Taylor told him that Taylor had disclosed to Misci that Primas was the source of the complaints about the firing of Fisher. *Id.* at 147. Primas's testimony is inadmissible hearsay if offered to prove the truth of Taylor's statement, and so I cannot consider it for that purpose. *See* Fed. R.Civ.P. 56(e).

although Primas points to several potential retaliatory acts, only one actually occurred after Fisher was fired: Primas's failure to receive a pay raise in 1999.

On the question of pretext, I conclude that Primas has met his burden to show that the Defendants' justifications for his failure to receive a pay raise are a pretext for retaliation, for substantially the same reasons as I explained in analyzing Sunkett's claims. *See* III.D.2., *supra.* Primas, like Sunkett, in effect accused Misci of wrongdoing, creating a motive for Misci to punish Primas.

 Finally, I conclude that Misci and, through him as final policymaker, the City of Camden, *see* III.D.2., *supra,* can be liable under § 1983 for the retaliatory denial of pay increases. Because Milan was also present during Taylor's tirade, and because a reasonable juror could infer his involvement in the Fisher matter, he, too, shares motive and opportunity to retaliate against Primas. A reasonable juror could find personal involvement on the part of Milan. Riondino, however, despite his presence at the same meeting, had no power to sanction Primas. Accordingly, I shall grant the summary judgment motions of Riondino and Buividas on this claim, but deny the motions of Misci, Milan, and Camden.

### 5. Lisa Roberts Taylor

 The premise of Roberts Taylor's free speech claims is her criticism of, and at times refusal to participate in, what she perceived to be a series of illegal contracts. *See* Pls.' Exh. 9A at 149, 153–54, 157. Even if Roberts Taylor was not technically correct about the legality of the proposed contracts, the allocation, and procedure for allocating, public funds is surely a matter of public concern. Moreover, she made her views known directly to Riondino and Misci, at times accusing them outright of

"skirting" the law. *See, e.g.,* Pls.' Exh. 9A at 154. Roberts Taylor was subsequently shunned by Misci, Riondino, and Buividas, *see* Pls.' Exh. 9A at 163, and she, too, received no pay increase in 1999, see Pls.' Exh. 47, which in light of their timing can reasonably give rise to an inference of causation. Accordingly, she has made out a prima facie case of retaliation. Furthermore, for much the same reasons as Primas and Sunkett, she has met her burden to show that her pay freeze was a pretext for retaliation. Finally, a reasonable juror could find that the Defendants' behavior in putting Roberts Taylor "on the outs" would have deterred a person of ordinary firmness from speaking. *Cf. Suppan,* 203 F.3d at 234 (citing *Rutan v. Republican Party,* 497 U.S. 62, 76 n. 8, 110 S.Ct. 2729, 111 L.Ed.2d 52 (1990)) (noting that acts as trivial as refusing to hold a birthday party can constitute First Amendment violations when intended as retaliation).

 This leaves me to unravel who may be liable under § 1983 for the constitutional violations Roberts Taylor has alleged. Misci, Riondino, and Buividas, according to Roberts Taylor's testimony, personally participated in ousting her from their "circle." *See* Pls.' Exh. 9A at 163. There is no evidence, however, that Buividas ever knew the reason his superiors ejected Roberts Taylor from their confidences, or that he knew of any of her protected activities. Nor is there evidence that Milan knew about Roberts Taylor's objections or her subsequent treatment. Certainly, there was no municipal policy arranging the social relations of the City's attorneys, such that Misci could serve as the final policymaker. Therefore, there is no liability on the part of Buividas, Milan, or Camden for putting Roberts Taylor "on the outs," and I will grant their motions for summary judgment on that ground. The motions of Misci and Riondino on this

ground will be denied. Turning to the pay issue, as with the other instances of retaliatory denial of raises, I conclude that Misci and the City alone are liable. Thus, I will deny the motions for summary judgment by Misci and Camden, but grant all others.

### 6. Carolyn Clarke

■ The only protected activity identified by Clarke is her complaint about the competence of Buividas. *See* Pls.' Br. at 61. However, the summary judgment record indicates that, rather than expressing concern about the fulfillment of the duties of a public employee, Clarke was merely chafing about the constraints of her job. *See* Pls.' Exh. 13 at 36. Clarke testified that she "went to Misci and I said to him I want to know if have to do Steven's work, do I have to correct his mistakes, do I have to fix his papers, do I have to file his papers, do I have to make his phone calls?" *Id.* She explained that this expostulation was motivated by a call from Buividas in which he asked her to call another attorney on his behalf. *See id.* It is evident that this was merely unprotected speech intended to "air personal grievances," *Swineford v. Snyder County Pennsylvania,* 15 F.3d 1258, 1271 (3d Cir.1994), rather than speech on a matter of public concern.

Even if Clarke's complaints were on matters of public concern, there is no evidence supporting an inference of causation between her speech and any sufficiently serious retaliatory acts. Clarke states that she was made to fetch books on three occasions, *see* Pls.' Exh. 13 at 49–50, and that she was assigned tedious administrative tasks. *Id.* at 62. As to the first, no reasonable juror could believe that any but

the thinnest of skins could be moved by a simple request to retrieve a text. Indeed, such are the everyday burdens of our bookish profession. Nor is there any evidence that the tedious task Clarke mentions commenced after, rather than before, her complaints about Buividas.

Accordingly, I shall grant summary judgment to all of the Defendants on Clarke's free speech claims.

### E. CEPA

■ I turn next to an analytically similar set of claims, based on the Plaintiffs' allegations that the Defendants' conduct violated CEPA.[10] To make out a prima facie claim, a plaintiff must show: (1) that he or she reasonably believed that his or her employer's conduct was violating either a law, a rule or regulation promulgated pursuant to law, or a clear mandate of public policy; (2) that he or she performed whistle-blowing activity described in [CEPA]; (3) an adverse employment action was taken against him or her; and (4) a causal connection exists between the whistle-blowing activity and the adverse employment action. *Blackburn v. United Parcel Service, Inc.,* 179 F.3d 81, 92 (3d Cir.1999) (citing *Kolb v. Burns,* 320 N.J.Super. 467, 727 A.2d 525, 530–31 (1999)); *Mehlman v. Mobil Oil Co.,* 153 N.J. 163, 185–87, 707 A.2d 1000, 1012 (1998). Once the plaintiff establishes a prima facie case, the Court must proceed to the familiar burden-shifting analysis that typifies claims of discrimination. *Blackburn,* 179 F.3d at 92.

■ In light of the close resemblance between these claims and the Plaintiffs' free speech claims, it is perhaps worth highlighting the principal doctrinal differ-

---

**10.** I previously dismissed Fisher's CEPA claims as untimely. *See Sunkett v. Misci,* No. 99–5371, slip op. at 14 (D.N.J. Jan. 22, 2001).

ences. First, whereas a free speech claim can be premised on any speech of "public concern," made in virtually any context, CEPA applies only to disclosures of violations of law, regulation, or clearly mandated public policy, made in circumstances proscribed by the statute—generally, the plaintiff must have disclosed the information to a supervisor or public body, or flat out refused to participate in the activity. *See* N.J. Stat. Ann. 34:19–3 (West 2000). Secondly, New Jersey limits the scope of actionable "retaliatory" acts to "the discharge, suspension or demotion of an employee, or other adverse employment action taken against an employee in the terms and conditions of employment." N.J. Stat. Ann. § 34:19–2(e) (West 2000). The phrase, "terms and conditions of employment," mirrors the language of Title VII, where it has been interpreted by the Third Circuit to require "materially adverse" acts by the employer, a considerably more demanding standard than for free speech claims. *See Robinson v. City of Pittsburgh*, 120 F.3d 1286, 1300–01 (3d Cir.1997).[11] Finally, the standard for employer liability under CEPA is lower than under § 1983, as New Jersey imposes *respondeat superior* liability upon employers. *See Abbamont v. Piscataway Township Bd. of Educ.*, 138 N.J. 405, 420–21, 650 A.2d 958 (1994).[12]

■ The practical implication of these differences, in this case, is that some of the incidents supporting Plaintiffs' free speech claims may not suffice to survive summary judgment under a CEPA theory. Most notably, Roberts Taylor's claim that she was put "on the outs" with the heads of the City Attorney's Office in retaliation for her objections to illegal contracts is not a sufficiently "adverse" act to be actionable under CEPA. *Cf. Shepherd v. Hunterdon Developmental Ctr.*, 336 N.J.Super. 395, 415–16, 765 A.2d 217, 228–29 (App.Div. 2001) (holding, in suit under NJLAD, that "a supervisor's decision to no longer socialize with a worker or be cordial would not alone" alter "the conditions of employment").

■ A closer question is whether Sunkett's allegation that his pay raise was withheld as a result of his complaints about his co-worker, Buividas, can support a claim under CEPA. Plainly, mere complaints about the competency of a colleague do not constitute objections to a violation of law, regulation, or clearly mandated public policy. On the other hand, taking as true Sunkett's assertion that the assignment of Buividas as second chair was an effort to mislead a state court about Buividas's availability for trial,

---

**11.** For both linguistic and policy reasons, I believe that the Third Circuit's view of the scope of retaliatory misdeeds by the employer actionable under Title VII is too cramped. *See Bostic v. AT & T of the Virgin Islands*, 166 F.Supp.2d 350, 361–62 (D.Virgin Islands 2001) (Orlofsky, J.). I therefore would resist importing it unnecessarily into another statute, but for the fact that New Jersey's use of the phrase "terms and conditions of employment" almost certainly requires me to do so.

**12.** I agree with my learned colleagues, Judges Bassler and Simandle, that New Jersey would likely allow individual liability for supervisors under CEPA. *See Espinosa v. Continental Airlines*, 80 F.Supp.2d 297, 305 (D.N.J.2000)

(Bassler, J.); *Palladino ex rel. United States v. VNA of Southern N.J., Inc.*, 68 F.Supp.2d 455, 471–74 (D.N.J.1999) (Simandle, J.). Of course, this leaves open the rather difficult question whether individual liability requires that the supervisors have aided and abetted the retaliation, the standard under the NJLAD, or whether they only need have had actual knowledge of and acquiescence in the retaliation, the lowest threshold under § 1983. Fortunately, the facts of this case do not offer any instances in which the Defendants' conduct falls in between the two standards, so that it is unnecessary for me to decide this question.

Sunkett's objection might reasonably be taken as objection to a violation of N.J. RPC 3.3(a)(1).[13] The Rules of Professional Conduct can supply a clear mandate of public policy under CEPA. *See Weiss v. Carpenter, Bennett, & Morrissey,* 143 N.J. 420, 442, 672 A.2d 1132, 1144 (1996)(citing *Pierce v. Ortho Pharmaceutical Corp.,* 84 N.J. 58, 72, 417 A.2d 505, 512 (1980)). While there is no direct evidence that Sunkett in fact believed that an ethical violation was taking place at the time he objected, a reasonable jury could infer as much from his long career as a practicing attorney, and his presumed familiarity with the Rules of Professional Conduct. *Cf. Regan v. City of New Brunswick,* 305 N.J.Super. 342, 356, 702 A.2d 523, 530 (App.Div.1997) (holding that court could properly infer that veteran officer believed there was a violation of the law based on his long experience with law enforcement). Thus, given the remaining factors I discussed relative to Sunkett's free speech claims, *see* III.D.2., *supra,* I conclude that Sunkett has met his burdens of production and persuasion on his CEPA claim, and I will deny the motions of Misci and Camden for summary judgment.

In all other respects, my analysis under CEPA is identical to my analysis under the First Amendment, and I shall grant in part and deny in part the remaining motions for summary judgment in the same fashion.

### F. NJLAD Retaliation

 To complete the trifecta of retaliation claims, I will now consider the Plaintiffs' claims that the retaliatory acts of the Defendants violated the NJLAD.[14] *See* 2d Am. Compl. ¶¶ 249–40, N.J. Stat. Ann. § 10:5–12(d) (West 2000). "To establish a cause of action under the LAD, plaintiff must prove that he or she engaged in protected activity known to the defendant, that he or she was subjected to an adverse employment decision by the defendant and that there was a causal link between the protected activity and the adverse employment decision." *Shepherd,* 336 N.J.Super. at 418, 765 A.2d at 229–30. If the plaintiff makes this showing, the burden shifts to the defendant to articulate a legitimate, non-retaliatory reason, whereupon the plaintiff must again shoulder the burden of persuading the court that the proffered reason is mere pretext for retaliation. *Id.* "Protected activities" include "oppos[ing] any practices or acts forbidden under this act." N.J. Stat. Ann. 10:5–12(d). In short, with the exception of the definition of "protected activity," and certain niceties related to the standards for individual and supervisory liability, *see infra,* an NJLAD claim is identical to a free speech claim.

 Of the six Plaintiffs, only Primas, Roberts Taylor, and Clarke have come forward with evidence that they engaged in protected activities. *See* Pls.' Br. at 61–64.

13. Rule of Professional Conduct 3.3 states:
 (a) A lawyer shall not knowingly:
 (1) make a false statement of material fact or law to a tribunal. . . .

14. The Plaintiffs also alleged unlawful retaliation under Title VII and the ADEA. *See* 2d Am. Compl. ¶¶ 263–64, 267–68. However, there is no evidence in the summary judgment record that any Plaintiff was retaliated against because "he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under [Title VII]." 42 U.S.C. § 2000e–3(a) (2000). Nor do Plaintiffs point to any evidence that they "opposed any practice made unlawful by [the ADEA]," or "made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or litigation under [the ADEA]." 29 U.S.C. § 623(d) (2000). Finally, there is no evidence in the summary judgment record that the Plaintiffs submitted their claims of retaliation to the EEOC before filing them with this Court.

I have already determined that there is no causal connection between Clarke's complaints and any alleged retaliatory acts. *See* III.D.6., *supra.* Similarly, although Roberts Taylor claims that she complained extensively to a number of City officials, there is no evidence that any of her grievances were ever made known to a Defendant with power to take action against her. Primas, however, has sufficiently established that he complained about an act covered under the NJLAD, that is, the firing of Fisher, and that a reasonable juror could find that Misci and Milan knew of his opposition. *See* III.D.4., *supra.* I have already concluded that Primas has carried his burden to show that the reasons given by the Defendants for denying Primas's pay raise could have been a pretext for retaliation. *Id.*

The remaining question for Primas is to what extent the various Defendants may be liable for the retaliation he suffered. Employers may be vicariously liable under the NJLAD. *See Lehmann v. Toys 'R' Us*, 132 N.J. 587, 617, 626 A.2d 445 (1993). Thus, if a supervisory employee violates the NJLAD while acting within the scope of his or her employment, the employer will be liable. *Id.* at 619, 626 A.2d 445. Individual employees are only liable to the extent that they " 'know ... [an]other's conduct constitutes a breach of duty and give[ ] substantial assistance or encouragement to the other so to conduct himself.' " *Failla v. City of Passaic*, 146 F.3d 149, 158 (3d Cir.1998) (quoting Restatement (Second) of Torts § 876(b)). The summary judgment record supports Primas's contention that Misci was acting within the scope of his employment when he withheld Primas's raise; establishing pay rates for the assistant city attorneys was a part of Misci's job. Thus, Camden is liable for Misci's misdeed. Further-

more, common sense suggests that Misci, an attorney supervising an office often engaged in employment discrimination litigation, knew that by aiding the City of Camden to retaliate against Primas, he was helping it to breach its duty to its employee. Thus, he can be liable under the NJLAD, as well. As I explained earlier, however, there is insufficient evidence to show that the other Defendants either knew of or participated in the pay hike denial. *See* III.D.4, *supra.*

Therefore, I shall deny the motions for summary judgment of Misci and Camden on Primas's NJLAD retaliation claim, but grant summary judgment on the NJLAD claims in all other respects.

## G. Race Discrimination

I turn now to the Plaintiffs' claims of race discrimination. The Plaintiffs allege that the Defendants' discriminatory acts violated the Fourteenth Amendment, the New Jersey Constitution, Title VII, § 1981, and the NJLAD. As the Plaintiffs have not come forward with any direct evidence of discrimination, *see* III.C.4., *supra*, I consider all of these claims under the familiar burden-shifting rubric for inferential claims. As the Plaintiffs share most of the relevant facts in common, I consider them together.

### 1. Differential Treatment

The Plaintiffs assert that, as a result of invidious racial animus, the Defendants subjected them to several significant, adverse employment actions. Specifically, Fisher states that he was discharged, and the remaining Plaintiffs other than Clarke aver that they were denied a pay increase during 1999.[15] Plaintiffs claiming such differential treatment must first establish that they were: (1) a member of the pro-

---

**15.** I deal with Plaintiffs' constructive discharge claims in part III.G.2., *infra.*

tected class; (2) qualified for the position sought or held; and (3) that nonmembers of the protected class were treated more favorably. *See Goosby v. Johnson & Johnson Medical, Inc.*, 228 F.3d 313, 318–19 (3d Cir.2000). Once a plaintiff establishes a prima facie case, the employer must come forward with a legitimate, non-discriminatory reason for the adverse employment decision. *See Duffy v. Paper Magic Group, Inc.*, 265 F.3d 163, 167 n. 1 (3d Cir.2001); *Goosby*, 228 F.3d at 319 (citing *Texas Dept. of Cmty. Affairs v. Burdine*, 450 U.S. 248, 254–56, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981)); *Stanziale v. Jargowsky*, 200 F.3d 101, 105 (3d Cir.2000) (citing *Showalter v. Univ. of Pittsburgh Med. Ctr.*, 190 F.3d 231, 234 (3d Cir.1999)). If the employer is able to proffer a legitimate, nondiscriminatory reason for its actions, the plaintiff must demonstrate that the proffered reason was merely a pretext for unlawful discrimination. *See Duffy*, 265 F.3d at 167 n. 1; *Goosby*, 228 F.3d at 319 (citing *Reeves v. Sanderson Plumbing Prods. Inc.*, 530 U.S. 133, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000)).

 Assuming, for the sake of argument, that the Plaintiffs have come forward with evidence supporting a prima facie case, they still cannot show that the Defendants' asserted reasons for the allegedly unlawful activities were a pretext for *race discrimination*. As I have explained above, I agree with the Plaintiffs that they have carried their burden to demonstrate that the Defendants' asserted reasons for firing Fisher, and for denying raises to most of the remaining Plaintiffs, are pretextual. However, the summary judgment record also suggests strongly that these deeds were a pretext not for racism, but rather for cronyism and retaliation. Roberts Taylor, for example, testified that she received a merit raise in 1998, based upon the recommendation of Misci. *See* Pls.' Exh. 67; 2d Am. Compl. ¶¶ 149–50. Obviously, there was no change in Roberts Taylor's race between 1998 and 1999; she was simply no longer in the political good graces of Misci. Similarly, Kille, a senior white attorney who was also outside of the "inner circle" of the office, received no raise in 1999. *See* Pls.' Exh. 47. Kille believed that he was also a target for termination. *See* Pls.' Exh. 3 at 162.

While the lines of political affiliation in the City Attorney's Office may well have left most of the white employees on the "inside," and most of the black employees on the "outside," that is not in itself determinative evidence of racial animus. In making this determination I am not unmindful of the other evidence of possible racial bias brought forward by the Plaintiffs. *See* III.C.4., *supra*. However, I find the more important feature of this particular set of facts the notion that " '[I]f the circumstances show that the defendant gave the false explanation to conceal something other than discrimination, the inference of discrimination will be weak or nonexistent.' " *Reeves*, 530 U.S. at 148, 120 S.Ct. 2097 (quoting *Fisher v. Vassar College*, 114 F.3d 1332, 1338 (2d Cir.1997) (en banc)). I conclude that, in light of the overwhelming evidence of political polarization and cronyism in the City Attorney's Office under Misci, *see, e.g.*, Pls.' Exh. 2 at 65–66, 78, 120, 140; Pls.' Exh. 8 at 62, 246; Pls.' Exh. 9A at 60, 77–80, 162–63; Pls.' Exh. 10 at 36, 64, 107, the handful of racist or racially insensitive remarks and acts pointed to by the Plaintiffs do not give rise to an inference of discrimination based upon their race.

#### 2. Harassment/Hostile Work Environment Claims

 The Plaintiffs also allege that, as a result of a variety of individually minor acts, the Defendants created a racially hos-

tile work environment. In order to go forward with their claim, the Plaintiffs must show: "(1) they suffered intentional discrimination because of their race; (2) the discrimination was pervasive and regular; (3) it detrimentally affected them; (4) it would have detrimentally affected a reasonable person of the same protected class in their position; and [for Title VII purposes only,] (5) there is a basis for vicarious liability." *Cardenas v. Massey*, 269 F.3d 251, 260 (3d Cir.2001). In drawing an inference of discrimination, I must consider the record as a whole, rather than individual incidents in isolation. *Id.* at 261.

■ The Plaintiffs have not sufficiently shown that the discriminatory acts they allege were "pervasive and regular," or that the acts directed at any of the Plaintiffs would have so affected a reasonable person as to amount to an alteration in the terms or conditions of employment. Although the Plaintiffs assert generally the existence of a hostile work environment, they ultimately point to only a handful of incidents in support of their contention. Each of the Plaintiffs, with the exception of Roberts Taylor and Clarke, identifies one or two instances in which a case they were assigned to was reassigned to another attorney, or in which they were detailed to a case on short notice. *See, e.g.,* Pls.' Exh. 11 at 130–31. The Plaintiffs also all claim that they suffered from a general lack of staff support, a condition that, according to the uncontested evidence in the summary judgment record, affected Misci as well,

Pls.' Exh. 4 at 87–89, and had been a constant from the very beginning of Misci's tenure. *See* Pls.' Exh. 11 at 154. The racist comments and behavior upon which Plaintiffs rely as direct evidence of racial animus, *see* III.C.4., *supra*, were for the most part not directed at the Plaintiffs. In sum, while the staffing problems the Plaintiffs identify may have been chronic, there is little evidence that they were attributable to race. Otherwise, with the exception of Clarke, the Plaintiffs have come forward with just a smattering of isolated incidents. They are well short of demonstrating that any harassment was "pervasive and regular." Moreover, the few incidents they have supported with evidence—principally, the case transfers, along with one angry exchange between Sunkett and Riondino—would not have detrimentally affected a reasonable person. "Minor or trivial actions that merely make an employee 'unhappy' are not sufficient to qualify" as terms, conditions, or privileges. *Mondzelewski*, 162 F.3d at 787 (quoting *Robinson*, 120 F.3d at 1300).[16] Shifting case assignments, while no doubt aggravating and at times burdensome, is not of the same character as permanent transfers, pay cuts, bad recommendations, or the like.

As for Clarke, she has not shown that any harassment was sufficiently serious that a reasonable person would have been detrimentally affected. Clarke points to a single remark by Buividas, her generally tedious caseload, and the fact that on three occasions she was asked to retrieve books.

---

**16.** It is unclear whether, in determining whether the employer's acts are sufficiently serious to qualify, I should look to each act individually, or consider them as a whole. *See Shaner v. Synthes*, 204 F.3d 494, 503 n. 9 (3d Cir.2000) (noting that Court would consider all of alleged acts as a whole in evaluating employer's discriminatory intent, but not deciding how to weigh effects of acts upon a

reasonable person); *see also Gupta v. Florida Bd. of Regents*, 212 F.3d 571, 588 (11th Cir. 2000) (weighing seriousness of all alleged misdeeds together in deciding whether they can constitute an "adverse" employment action). Since I conclude that all of the remaining acts alleged by the Plaintiffs, even taken together, would not be "adverse," I need not resolve this question.

Again, I take judicial notice of the fact that the burdens about which she complains, aside from the remark by Buividas, are borne routinely by lawyers everywhere. Nor can one insensitive comment, immediately repented, see Pls.' Exh. 13 at 57, elevate such minor acts to actionable harassment.

Finally, I note that my conclusion that the acts alleged by the Plaintiffs would not detrimentally affect a reasonable person necessarily implies that none of the Plaintiffs was constructively discharged. *See Duffy*, 265 F.3d at 168–69.

Accordingly, I must grant the Defendants' motions for summary judgment on all of the Plaintiffs' claims alleging racial discrimination under Title VII, § 1981, the Fourteenth Amendment, the NJLAD, and the New Jersey Constitution Article I ¶ 5.

## H. Section 1985—Conspiracy to Discriminate

The Plaintiffs have alleged that various Defendants conspired together at times to deprive them of their constitutional right to be free of invidious discrimination based upon race. *See* 2d Am. Compl. ¶¶ 229–37. In order to state a claim under § 1985(3), the Plaintiffs must first demonstrate that there has been an actual deprivation of their rights. *See Lake*, 112 F.3d at 685 (citing *Scott*, 463 U.S. at 828–29, 103 S.Ct. 3352; *Griffin*, 403 U.S. at 102–03, 91 S.Ct. 1790). Since I have concluded that there was not, *see* III.G., *supra*, I must grant summary judgment on the § 1985(3) claims.

## I. ADEA Discrimination—Primas and Sunkett

Both Primas and Sunkett claim that the acts of the Defendants violated their right to be free of age discrimination under the ADEA. *See* 2d Am. Compl. ¶¶ 265–266. Even assuming that Primas and Sunkett have made out prima facie cases of discrimination, they point to no evidence in the summary judgment record that could lead a reasonable juror to find that the reasons offered by the Defendants for the alleged discriminatory acts were a pretext for age discrimination. Indeed, the evidence of age discrimination is far thinner than even the evidence for intentional discrimination based on race. I have already determined that the Plaintiffs cannot meet their burden on that ground. *See* III.G., *supra*. I will, therefore, grant the Defendants' motions for summary judgment on the ADEA claims of Primas and Sunkett.

## J. Due Process Liberty Interest— Fisher

██ Fisher has come forward with something resembling evidence that one or more of the Defendants may have violated his due process liberty interest in his professional reputation. Again, in order to make out a Fourteenth Amendment liberty interest, a plaintiff must show that he or she was stigmatized by information related to his discharge, which was published or otherwise disseminated by the employer to the public. *See Anderson*, 845 F.2d at 1221–22. Fisher points to his own testimony relating that friends of his read to him over the telephone a newspaper article which, he claims, contained false and damaging information about his termination. *See* Pls.' Exh. 8 at 109–10. Fisher claims that the author of the article, who is not identified by name, was "a Milan friend." *Id.* at 110. Apparently, this is intended to support an inference that Milan was the source of the damaging information. In any event, I cannot consider Fisher's statements about the content or authorship of the article, since, in the absence of

the article itself, his testimony is hearsay.[17] His testimony is double hearsay if offered for the truth of statements in the article, such as the source of any quotations therein. Since Fisher offers no other evidence that the allegedly stigmatizing information was "published or otherwise disseminated," I must grant the Defendants' motions for summary judgment on his due process liberty claim.

### K. Civil Conspiracy

 The Plaintiffs have also alleged that the various Defendants conspired together to commit unlawful acts, a common law tort in New Jersey. *See* 2d Am. Compl. ¶¶ 238–40; *Morgan v. Union County Bd. of Chosen Freeholders,* 268 N.J.Super. 337, 364, 633 A.2d 985, 998 (App.Div.1993), *certification denied,* 135 N.J. 468, 640 A.2d 850 (1994). "A civil conspiracy is 'a combination of two or more persons acting in concert to commit an unlawful act, or to commit a lawful act by unlawful means, the principal element of which is an agreement between the parties to inflict a wrong against or injury upon another, and an overt act that results in damage.'" *Morgan,* 268 N.J.Super. at 364, 633 A.2d at 998 (quoting *Rotermund v. United States Steel Corp.,* 474 F.2d 1139, 1145 (8th Cir.1973)). There is no claim in the absence of an underlying wrong. *See id.* (citing *Bd. of Educ. v. Hoek,* 38 N.J. 213, 238, 183 A.2d 633 (1962)); *Farris v. County of Camden,* 61 F.Supp.2d 307, 326 (D.N.J.1999).

 The Plaintiffs have failed to establish that the conspiracy they allege was engaged in by two or more "persons." When the officers of a corporation are acting in their corporate capacity, they cannot conspire with the corporation alone.

*See Robison v. Canterbury Village, Inc.,* 848 F.2d 424, 431 (3d Cir.1988). Similarly, officers of governmental entities cannot conspire with the entity. *See Farris,* 61 F.Supp.2d at 329–30; *cf. Gregory v. Chehi,* 843 F.2d 111, 118 n. 4 (3d Cir.1988) (expressing doubts whether town officers can conspire with town). In both cases, the rationale is simple: An abstract entity can only act through its officers, so that a conspiracy between the officers and the entity is like a dance with one's own shadow. The exception is if the officers are acting "outside the course and scope of their employment," in which case they are no longer representing the employer entity. *Heffernan v. Hunter,* 189 F.3d 405, 412 (3d Cir.1999). The same principles suggest that officers acting within the scope of their employment cannot conspire together. If Agent A and Agent B both act together to employ power that they wield only as a result of their service to Principal A, there is, in truth, only one actor, Principal A. Thus, I agree with the sensible rule suggested by my colleague in the Eastern District of Pennsylvania, Judge Troutman, that officers cannot conspire together unless they have the power to carry out the purposes of the conspiracy when acting outside the scope of their employment. *See Rose v. Morning Call, Inc.,* No. Civ. A. 96–2973, 1997 WL 158397, at * 8 (E.D.Pa. Mar. 28, 1997); *see also Dickerson v. Alachua County Comm'n,* 200 F.3d 761, 767 (11th Cir.2000); *Jackson v. T & N Van Service,* No. Civ. A. 99–1267, 2000 WL 562741, at *5 (E.D.Pa. May 9, 2000). *But see Dooley v. City of Philadelphia,* 153 F.Supp.2d 628, 661 (E.D.Pa. 2001).

Thus, in order to prevail, the Plaintiffs here must show that the individual Defen-

---

**17.** For counsel's reference, I note that back issues of the Courier Post are available on microfilm at the Camden County and Cherry Hill libraries. *See* <www.courierpostonline.com/about/index.html> (visited Jan. 22, 2002).

dants had the power to carry out the alleged underlying substantive violations when acting outside the scope of the Defendants' employment. With the exception of Roberts Taylor, I have already determined that the substantive violations of the Plaintiffs' rights are limited to denials of raises, and, in Fisher's case, termination. Plainly, the Defendants had power to carry out these acts only in their capacities as employees of the City of Camden. Accordingly, I must conclude that they did not have the legal capacity to conspire together. As for Roberts Taylor, I have determined that a reasonable juror could find that her free speech rights were violated by the acts of Misci and Riondino in putting her "on the outs" with the leadership of the City Attorney's Office. *See* III.D.5., *supra.* Misci and Riondino had the power to shun Roberts Taylor regardless of their relationship with the City of Camden, and it does not appear they used their power to assign cases, offices, or other emoluments in order to enforce her exclusion. Thus, they acted outside the scope of their employment, a determination that opens each of them to individual liability for conspiracy, but which necessarily shields the City of Camden from liability.

Therefore, I will grant the motions for summary judgment of all of the Defendants on the civil conspiracy claims by the Plaintiffs, with the exception of so much of the motions of Misci and Riondino as pertain to Roberts Taylor's claim that their collective cold shoulder constituted a conspiracy to deny her freedom of speech.

## IV. CONCLUSION

Thanks to the profusion of parties, facts, and allegations, my resolution of these motions defies easy summary. To put it as concisely as possible, however, I have: (1) denied the Defendants' Motion to Strike the Testimony of Mark Willis, pursuant to Fed.R.Civ.P. 37; (2) granted in its entirety the motion for summary judgment of Buividas; (3) granted the motions for summary judgment of all Defendants on all claims by Clarke; (4) granted the Defendants' motions for summary judgment on all of the Plaintiffs' race and age discrimination claims, as well as on the Plaintiffs' claims under the Due Process Clause and under 42 U.S.C. § 1985(3); (5) granted summary judgment to all Defendants on Henderson's free speech and state law retaliation claims; (6) granted summary judgment to all defendants on the NJLAD claims of Fisher, Sunkett, and Roberts Taylor; (7) granted summary judgment to all defendants on Fisher's free speech claims stemming from the Horta incident; (8) granted summary judgment to all Defendants on so much of Sunkett and Primas's free speech and state law retaliation claims as depended upon any adverse act other than the failure to grant a pay raise in 1999; (9) granted summary judgment to Riondino and Milan on Sunkett's free speech and CEPA claims; (10) granted Riondino's motion for summary judgment on Primas's free speech and state law retaliation claims; (11) granted summary judgment to all Defendants on Roberts Taylor's CEPA claims, other than those based on her failure to receive a pay increase in 1999; (12) granted summary judgment to Milan on Roberts Taylor's free speech and CEPA claims; (13) granted summary judgment to Riondino on Roberts Taylor's claim that he was liable for causing her to miss out on a pay increase in 1999, in violation of her free speech and CEPA rights; (14) granted summary judgment to all Defendants on the civil conspiracy claims of Sunkett, Henderson, Primas, and Fisher; (15) granted summary judgment to Milan and the City of Camden on Roberts Taylor's civil conspiracy claim, and to Misci and

Riondino on all of Roberts Taylor's civil conspiracy claim except that part alleging that they conspired together to deprive her of their society, in violation of her right to free speech; (16) granted summary judgment on all of Plaintiffs' Title VII and ADEA retaliation claims; and, finally (17) denied summary judgment in all other respects.

The Court will enter an appropriate form of Order.