

2000 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

9-25-2000

# Goosby v. Johnson & Johnson

Precedential or Non-Precedential:

Docket 99-3819

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2000

Recommended Citation

"Goosby v. Johnson & Johnson" (2000). *2000 Decisions.* Paper 203.
http://digitalcommons.law.villanova.edu/thirdcircuit_2000/203

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2000 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

Filed September 25, 2000

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

No. 99-3819

DEBORAH S. GOOSBY,

      Appellant

v.

JOHNSON & JOHNSON MEDICAL, INC.

ON APPEAL FROM THE
UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA
Civil No.: 98-cv-0097
District Court Judge: Honorable Donetta W. Ambrose.

Argued: June 30, 2000

Before: ALITO, McKEE, Circuit Judges and
FULLAM,* District Judge

(Filed: September 25, 2000)

      Domenic A. Bellisario, Esq. (Argued)
      1000 Law & Finance Building
      Pittsburgh, PA 15219

       Attorney for Appellant

---

*Hon. John P. Fullam, Senior Judge of the United States District Court
for the Eastern District of Pennsylvania, sitting by designation.

Richard F. Shaw, Esq. (Argued)
Amy E. Dias
Maureen T. Taylor
JONES, DAY, REAVIS & POGUE
500 Grant Street
Pittsburgh, PA 15219

Attorneys for Appellee

OPINION OF THE COURT

McKEE, Circuit Judge.

Deborah S. Goosby, a Black female, brought this Title VII action against her former employer, Johnson & Johnson Medical Inc. ("JJMI"), alleging that certain adverse employment decisions were the result of illegal racial and gender bias. The district court granted JJMI's motion for summary judgment and dismissed all of Goosby's claims. For the reasons that follow, we will reverse in part and affirm in part, and remand for further proceedings consistent with this opinion.

I.

JJMI initially hired Goosby as a Territory Assistant in Virginia in 1990, and she was subsequently transferred from Virginia to JJMI's Empire Division in New York. There, she worked as a Sales Representative and was later promoted to Senior Sales Representative. In January 1992, Ms. Goosby was transferred to the Three Rivers Division in Pennsylvania where she was working when she filed this suit. She was the only Black female in that division, and her direct supervisor there was the Division Manager, Martin Murray. Murray reported to the Regional Manager, Ron Evans.

Goosby's responsibilities at Three Rivers consisted primarily of selling operating room related products to Western Pennsylvania area hospitals. In November 1994, JJMI restructured its sales force by creating three new positions: (1) Account Manager ("AM"); (2) Surgical

2

Specialist Representative ("SSR"); and (3) Continuing Care Representative ("CCR"), and assigning its sales representatives to one of those three new positions. The AM & SSR positions involved essentially the same hospital customers, and many of the same products, Goosby had been servicing before the reorganization. The CCR position, on the other hand, was geared toward the nursing home market -- which JJMI was attempting to enter for the first time -- and involved products Goosby was not familiar with.

Goosby expressed interest in the SSR and AM positions because they involved selling the same products and utilizing the same sales contacts she was involved with before the reorganization. In addition, because JJMI was relatively new to the nursing home market, the CCR position required calling sales referrals she did not know. This "cold-calling" was far more difficult than calling established customers. Goosby alleges without contradiction that she had been so effective selling to her old customers that she had won several awards for exceptional sales including recognition for the highest sales volume, and induction into the company's "Ring Club" for outstanding sales performance. App. at 526. She also had the highest average commissions within her division and alleges that her customers had high regard for her. App. at 503-16.

Goosby believed that the AM and SSR positions were preferable to the CCR position because both appeared to provide greater opportunity sales and would therefore result in larger commissions and better promotions. She also based her belief in part upon a conversation with a JJMI representative who had told her that the AM position was for the "best of the best" and that AM positions had been assigned only to employees that the company believed in. App. at 441-444. Goosby alleges that the CCR position, on the other hand, was for employees that the company wanted to get rid of.

JJMI developed a competency assessment tool (the "Matrix") to match employees with the new positions. According to JJMI, the District Managers evaluated each of his/her employees according to eight competencies and five

3

skill sets that the District Managers were given to use as evaluators.[1] The Division Managers assigned each of his/her employees a score from "one" to "five" for each competency and skill set and sent the completed forms to the Regional Manager.[2] The Regional Manager then applied various weights to the Matrix scores to reflect the different competencies required for each position. For example, according to JJMI, the most important qualifications for the CCR position were drive, selling process, relationship building, product knowledge and presentation skills while administrative and organizational skills were the primary attributes of an AM. Each employee was then given a separate score for each of the new positions based upon the weighted calculations of the Matrix. The lowest score for a particular position indicated which of the three positions the employee was most qualified for. However, JJMI concedes that each Division Manager also recommended placements for the employees he/she supervised when the Division Manager sent the Matrix to the Regional Manager.

Goosby received poor scores in administrative, time management, and organizational skills but she received high scores in relationship building and presentation skills. App. at 199. Her scores for drive, product knowledge, business savvy, and pricing/contracts were satisfactory. Id. Based solely upon the weighted numerical ranking that resulted from those scores, the Matrix indicated that she was best suited for the CCR position; and Division

_____

1. The listed competencies were drive, selling process, relationship building, product knowledge, business savvy, analytical, administrative, and time management. The listed skill sets were computer skills, leadership, pricing and contracts, presentation skills, and organization skills.

2. The numbers assigned to the skills were as follows:

       1- outstanding; 2- consistently exceeds standards;
       3- meeting standards in this area;
       4- occasionally meets standards;
       5- does not meet standards

Thus, under this system, the position which yielded the lowest score after the weights were attached, was ostensibly the position for which the employee was most suited.

4

Manager, Martin Murray, recommended her for that position when he sent the completed Matrix to the Regional Manager. Id.; App. at 189.

Goosby was subsequently assigned to the CCR position, but she was openly displeased. Five days after being informed of the assignment, she filed a charge of race and sex discrimination with the EEOC and the Pennsylvania Human Relations Commission ("PHRC"). In the latter she alleged a violation of the Pennsylvania Human Relations Act. 43 P.S. S 955 ("PHRA").3

Despite her displeasure with her assignment, Goosby began working as a CCR on January 1, 1995. However, in May 1995, she took a short-term disability leave. Under JJMI's disability policy, salaried employees were allowed to remain on short-term disability for a maximum of twenty-six weeks, but JJMI reserved the right to reassign afield sales employee's sales territory (Goosby's CCR position) after twelve weeks of disability leave. The policy also required the employee to "communicate any unexpected change in medical status to the medical department[of JJMI]." App. at 265. The employee could not return without submitting a "return-to-work authorization" form by which the treating physician confirmed the employee's ability to perform the full scope of his/her job. App. at 264-67. Goosby was medically cleared to return to work and did return on July 11, 1995.

However, Goosby took a second disability leave on August 14, 1995. On November 17, 1995, her treating physician again authorized her return to work, but only in a limited capacity. Accordingly, Evans and Murray compiled a list of possible reduced duty jobs that Goosby could perform consistent with her physician's authorization. App. at 145. However, JJMI never extended an offer for limited duty because Evans and Murray subsequently concluded that an employee could not discharge the responsibilities of a CCR

_____

3. The analysis required for adjudicating Goosby's claim under PHRA is identical to a Title VII inquiry. Jones v. School District of Philadelphia,
198 F.3d 403, 410-11 (3d Cir. 1999), and we therefore do not need to separately address her claim under the PHRA.

5

on a reduced duty basis. App. at 298. Accordingly, Goosby remained on disability leave.

The second twenty-six week leave that Goosby was entitled to ended on February 14, 1996, under JJMI's policy; but Goosby had not yet been cleared to return to work on that date. Goosby now claims that the delay in returning resulted from JJMI's failure to send the necessary authorization forms for her doctor's approval. However, JJMI argues that specific forms are not necessary. According to JJMI, Goosby only had to obtain a letter from her treating physician stating that he/she unconditionally cleared Goosby to return to work full time. App. at 272, 276-77.

On March 6, 1996, Goosby learned that JJMI had permanently reassigned her territory to another sales representative. Six days later, she did finally submit an unrestricted medical clearance from her treating physician. The authorization stated that Goosby had been capable of returning to work as early as February 14, 1996. App. at 322. However, JJMI had already filled Goosby's CCR position, and it was therefore not available. JJMI did, however, offer Goosby a CCR position in Buffalo, New York. JJMI claims that was the only CCR position available at the time. App. at 323-7. Goosby failed to respond to the offer, and JJMI thereafter terminated her employment.

On January 14, 1998, Goosby filed the instant action in the district court alleging race and gender discrimination in violation of 42 U.S.C. S 1981 ("Title VII"), and the PHRA. She alleges that the discrimination consists of her assignment to the CCR position, JJMI's refusal to allow her to work in a restricted duty capacity, and the reassignment of her territory while she was on disability leave. Goosby also claims that JJMI illegally retaliated against her for the first charge of discrimination that she had filed with the EEOC.4 Following discovery, the district court accepted the magistrate judge's report and recommendation, and granted JJMI's motion for summary judgment on all of Goosby's claims. This appeal followed.

_____

4. The EEOC had investigated and found her original charges were meritorious.

6

II.

Our review of a grant of summary judgment is de novo. See Carter v. Rafferty, 826 F.2d 1299, 1304 (3d Cir. 1987). Summary judgement is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c).

III.

Title VII and the PHRA both prohibit an employer from engaging in race or gender discrimination against an employee. Under the oft cited decision in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973), Goosby mustfirst establish a prima facie case of discrimination. To do so she must offer sufficient evidence that she was: (1) a member of the protected class, (2) qualified for the position she sought, and (3) nonmembers of the protected class were treated more favorably. See Ezold v. Wolf, Block, Schorr and Solis-Cohen, 983 F.2d 509, 522 (3d Cir. 1993). Once a plaintiff under Title VII establishes a prima facie case, the employer must come forward with a legitimate, non-discriminatory reason for the adverse employment decision. See Texas Dept. of Community Affairs v. Burdine, 450 U.S. 248, 254-56 (1981). If the employer is able to proffer a legitimate, nondiscriminatory reason for its actions, the plaintiff must demonstrate that the proffered reason was merely a pretext for unlawful discrimination. See Reeves v. Sanderson Plumbing Products Inc., 120 S.Ct. 2097 (2000).

IV.

The district court concluded that Goosby had established a prima facie case, and we agree. She can obviously satisfy the first prong of the inquiry as a Black female. Secondly, the AM and SSR positions involved the products and customers she had dealt with prior to the restructuring. She had not only performed those duties well, she had excelled. As noted above, she earned the highest average sales commissions within her division, and her sales ability

7

won her national recognition. We therefore conclude that Goosby has established her qualifications for the two positions she sought.

However, before we address JJMI's explanation for its employment decisions, we must address a dispute about whether JJMI's decision to award Goosby the CCR position really was an "adverse employment decision." JJMI argues that each of the three positions it created during the reorganization had equivalent compensation and the opportunity for advancement and promotions was the same. However, as noted above, Goosby testified in her deposition that the CCR position was the least desirable because it operated in a new market, and the AM and SSR positions dealt with established customers. Therefore, she contends, it would be much harder for her to achieve the same level of sales in her new CCR position despite JJMI's assurances that the three positions were equal. Goosby also testified that AMs were viewed by the company as the best employees and placement in that position improved an employee's chances of promotion and recognition. JJMI disputes this by arguing that it would not go to the expense and effort necessary to successfully compete in the new market the CCR position was aimed at and then assign employees it didn't intend to keep to develop the new area of sales.

The divergence of Goosby's view of the CCR position and her employer's rejoinder obviously creates a genuine issue of material fact as to whether Goosby was treated adversely. Inasmuch as we are reviewing a grant of summary judgment, we must accept Goosby's assertion that the CCR position was less desirable than the other two. Accordingly, we must examine JJMI's explanation for awarding Goosby the CCR position. See Jones v. School Dist. of Phila., 198 F.3d 403, 410 (3d Cir. 1999). JJMI justifies Goosby's assignment to the CCR by arguing that it was dictated by the objective scoring of the Matrix that Evans, not Murray completed. According to JJMI, Goosby's assignment was determined by her poor administrative skills score. JJMI points out that those low scores were consistent with, and confirmed by, several performance evaluations wherein Goosby's administrative and

8

organizational skills had been evaluated as needing improvement. App. at 205, 213, 221, 223, 231, 238, 241, 257. JJMI asserts that those were the skills that were most important to the positions Goosby preferred.[5]

JJMI argues that Murray did not even know how the "objective" rating he gave Goosby would be weighed when he completed the Matrix. Moreover, Goosby concedes that her Matrix score is consistent with her assignment to the CCR position given JJMI's scoring system, and that she does have the administrative weaknesses that JJMI claims lead to her assignment as a CCR. However, Goosby argues that JJMI's stated reliance on the Matrix was itself merely a pretext to camouflage the subjective decision of Division Manager, Martin Murray, and that Murray's recommendation actually caused her placement. She claims that Murray ran a "good old boys" network that has adversely effected her since she began working in the Three Rivers Division. She suggests that this is reflected in the fact that her pay increases were "drastically reduced" by Murray, see App. 423-4, despite her stellar sales, and in Murray's practice of inviting the White males in the division to play golf, as well as the discriminatory manner in which Murray handled complaints against various employees in his division.

Goosby insists that her assignment as a CCR reflects Murray's bias rather than her Matrix score, and she points to situations where the Matrix score supported one assignment, but Murray contemporaneously recommended another. In the instances she refers to, the ultimate assignment was consistent with Murray's recommendation; not the purportedly objective scoring of the Matrix. For example, according to the Matrix score, employee Naetzker should have been assigned to an SSR or CCR position. App. at 197. However, Murray recommended Naetzker to be placed into an AM position, and Murray's recommendation was honored. Similarly, the Matrix scoring indicated that employees Kennedy and Deluca should become CCRs. App. at 198, 200. However, Murray recommended that both

_____

5. JJMI maintains that employees' preferences were irrelevant as they weren't considered in making the placements.

9

employees be awarded positions as AMs, and his recommendations were once again honored.

Goosby also argues that other employees with poor scores for administrative and organizational ability were nevertheless awarded the "preferable" positions purportedly denied her because of those weaknesses. That allegation, if proven, would support a finding of discrimination despite her administrative weaknesses. JJMI attempts to explain this discrepancy by pointing out that only a limited number of employees were needed to fill each position and therefore the Matrix could not always be followed. That may well be, however, a reasonable fact finder could also conclude that the Matrix did not have the importance JJMI claims, and that JJMI's reliance on it to explain Goosby's placement is merely a pretext to cover Murray's discriminatory motive in not recommending her for the "better" positions. See Meritor Sav. Bank, F.S.B. v. Vinson, 477 U.S. 57, 75 (1986) ("An employer can act only through individual supervisors. . . discrimination is rarely carried out pursuant to a formal vote of a corporation's board of directors."). Moreover, the Matrix criteria and their weighting are themselves highly subjective even though they are given an apparently objective numerical ranking. Accordingly, the Matrix does not insulate JJMI to the extent that JJMI suggests. "[S]ubjective evaluations are more susceptible of abuse and more likely to mask pretext." See Weldon v. Kraft, Inc., 896 F.2d 793, 798 (3d Cir. 1990)(citations and internal quotations omitted).

> We have held that while objective job qualifications should be considered in evaluating a plaintiff 's prima facie case, the question of whether an employee possesses a subjective quality, such as leadership or management skill, is better left to the later stage of the McDonnel Douglas analysis.

Id.

Moreover, "subjective" scoring is sometimes based upon factors that are too speculative to base a meaningful comparison. Carter v. Three Springs Residential Treatment, 132 F.3d 635, 644 (11th Cir. 1998). In Carter , the court held that an employer's reliance on plaintiff 's lack of

10

"special knowledge and skills" was "too subjective to allow for any meaningful comparison between [two applicants]." Id. at 644. The court noted that other requirements such as "initiative and judgment capabilities" and the ability "to relate to people in a manner to win confidence and establish support" can not be evaluated objectively and therefore should not be relied upon to overcome a prima facie case of discrimination. Id.

Of course, a plaintiff can not ultimately prove discrimination merely because his/her employer relied upon highly subjective qualities (i.e. "drive" or "enthusiasm") in making an employment decision. However, just as use of such criteria does not establish discrimination, cloaking such criteria with an appearance of objectivity does not immunize an employment decision from a claim of discrimination.

> Although courts must be careful not to second-guess an employer's business judgment that it makes in good faith, plaintiff must be allowed to show that her employer's asserted reasons for discharging her were a pretext and that the real reason was [illegal discrimination].

Gallo v. Prudential Residential Services, 22 F.3d 1219, 1226 (2nd Cir. 1994) (citing St. Mary's Honor Center v. Hicks, 509 U.S. 502, 519 (1993).

JJMI also argues that Goosby's claim of gender discrimination should be dismissed because the only other woman in her division was assigned to a position as an AM. However, that does not necessarily defeat Goosby's claim of gender bias. Clearly, an employer does not have to discriminate against all members of a class to illegally discriminate against a given member of that class. See Pivirotto v. Innovative Systems, 191 F. 3d 344, 353-4 (3rd Cir. 1999) ("even if a woman is fired and replaced by another woman, she may have been treated differently from similarly situated male employees."). Within the atmosphere of the "old boys' network" that Goosby alleges, it is certainly possible that some females may have been preferred because they were more "like one of the boys" than Goosby. Id. at 354 ("an employer may fire women who fail to act in

11

a particular manner" or who appear more assertive and "less feminine"). In addition, it is conceivable that an employer who harbors a discriminatory animus may nevertheless allow one or two females to advance for the sake of appearances.

Moreover, evidence that JJMI afforded a White female an assignment that it denied to a Black female hardly defeats a claim of race/gender discrimination brought by a Black female.

We are, of course, reviewing a grant of summary judgment, and we do not suggest that JJMI is guilty of race and/or gender discrimination, or that Goosby will ultimately be able to prove the discrimination she is alleging. Goosby admits to having problems with administrative tasks, and JJMI argues that the positions she sought placed a premium on the very areas where Goosby admits to being weakest. However, Goosby's claim that she was treated less favorably than White males with similar weaknesses can not be decided as a matter of law. In an employment discrimination case "a trial court must be cautious about granting summary judgment to an employer when, as here, its intent is at issue." Gallo v. Prudential Residential Services, Ltd. Partnership , 22 F.3d 1219, 1224 (2d Cir. 1994). Inasmuch as there are genuine issues of material fact as to JJMI's motives in assigning Goosby to the CCR position, we hold that the district court erred in granting JJMI summary judgment on that portion of Goosby's claim. Accordingly, the court's dismissal of Goosby's Title VII and PHRA claims based upon JJMI's failure to place her in the AM or SSR position will be reversed.

V.

Goosby also alleges that JJMI discriminated against her by not allowing her to return to work in a limited duty capacity. As noted above, JJMI explained that it"did not have a restricted duty policy for any field sales employees" because "a sales employee [such as Goosby] could not perform all the essential tasks, such as makingfield visits to existing and potential customers, if they were on

12

restricted duty." App. at 49. When Goosby's physician first released her for restricted duty, her supervisors began discussing possible options. On October 16, 1995, Evans e-mailed Murray with a list of reduced activities which JJMI would have Goosby perform if they "decide[d] to recommend a reduced activity assignment." App. 486. A few days later, Evans sent a memo to Pat Van Wye, JJMI's leave coordinator, stating "I am of the opinion we should aggressively move forward and . . . potentially establish a reduced duty assignment." App. at 488. He attached the list of potential reduced duty activities to that memo. However, before any firm offer was made, Evans and Murray decided to only allow the return of a field sales representative such as Goosby if the representative was capable of performing his/her full duties. There is no evidence that any other JJMI sales representative was ever allowed to work in a limited capacity, and Goosby has not produced any evidence that JJMI's explanation for its refusal to offer her such a position was pretextual. Therefore, the district court did not err in dismissing this portion of Goosby's claim.

VI.

Ms. Goosby also claims that JJMI discriminated against her by permanently filling her position while she was on leave. However, as noted above, JJMI's short term disability policy provided for a maximum of twenty-six weeks disability leave and guaranteed only that a field sales employee's territory would remain open for the first twelve weeks of that leave. App. 264-66. Moreover, before returning to work, an employee on leave was clearly required to submit a medical release from a treating physician.

It is undisputed that Goosby's twenty-six weeks of leave expired on February 14, 1996 and that she did not submit her doctor's authorization until after that date. She argues that the authorization was delayed because JJMI did not send her the paperwork for completion until February 6, 1996. We find that excuse unavailing. JJMI asserts that it would have accepted a letter from her treating physician, and had done so in the past, so that Goosby knew that she did not have to wait for specific forms to obtain her

13

physician's authorization to return to work. However, even if that claim is not accurate, Goosby clearly knew the clock was ticking and she had sufficient time between the forms being sent and the expiration of her leave period to return the forms to JJMI. She failed to do so. Absent any evidence that she was unable to comply with JJMI's policy because of something JJMI did, we are not persuaded that there is a genuine issue of material fact as to this issue.

Goosby argues that, although the short term disability policy did exist, JJMI did not uniformly follow it. A violation of company policy can constitute a pretext for unlawful discrimination if others similarly situated also violated the policy with no adverse consequence. See Delli Santi v. CNA Ins. Companies, 88 F.3d 192, 203-4 (3d Cir.1996). Goosby points to two White female employees who returned to work in their original positions after being on leave for more than twenty-six weeks. Appellant's Brief at 27. However, even assuming that is true, Goosby has not demonstrated that either of those employees was similarly situated to her. Goosby can not establish the type of leave those women took or whether their paperwork was submitted on time. Thus, Goosby can not overcome JJMI's reliance on its established policy, and the district court properly concluded that JJMI was entitled to summary judgment on the portion of Goosby's claim that arose from her termination following her disability leave.

VII.

Finally, Goosby claims that JJMI unlawfully retaliated against her for filing a charge of discrimination. To establish a prima facie claim of retaliation, a plaintiff must show that he/she is engaged in protected activity, that the employer took an adverse employment action against him/her, and that there is a causal connection between the protected activity and the adverse employment action. See Woodson v. Scott Paper Co., 109 F.3d 913, 920 (3d Cir. 1997). Goosby filed the relevant charges with the EEOC on November 28, 1994 and claims that JJMI retaliated by not allowing her to return to work in a restricted duty capacity and by reassigning her territory before her return.

14

The district court disposed of that claim as follows:

> plaintiff 's argument . . . does not provide a jury with sufficient evidence from which an inference of retaliation can be made. Plaintiff does not, and cannot, contest that her position was held open to her for a full 26 weeks of disability leave. . . Further, plaintiff concedes that defendant requested from her, prior to the expiration of her sick leave, a return to work authorization, and that she did not provide such an authorization until almost a month after her sick leave expired. No inference of retaliation can be rationally drawn from these facts.

App. at 603-4.

We agree. In addition, the time frame between Goosby's EEOC filing and the alleged retaliation weighs against the causation that she must establish. There was nearly a full year between the first filing with the EEOC and Goosby's attempts to return to work on restricted duty, and almost fifteen months passed before she was permanently replaced and ultimately terminated. Although such a lapse may not prevent a plaintiff from establishing the required nexus in every case, given the circumstances here Goosby can not establish that a genuine dispute as to the material fact of causation. There is nothing to suggest any link between the EEOC filing and the adverse job action that followed.

VIII.

For the foregoing reasons, the district court's dismissal of Goosby's claim of discrimination based on her assignment to a CCR position is reversed and remanded for further proceedings consistent with this opinion. The district court's grant of summary judgment to JJMI is affirmed in all other respects.

A True Copy:
Teste:

> Clerk of the United States Court of Appeals
> for the Third Circuit

15