**A. Dolores WILLIAMS, Appellant,**

**v.**

**URS CORP., et al., Appellees.**

**No. 04–1055.**

United States Court of Appeals, Third Circuit.

Argued Nov. 16, 2004.

Decided Feb. 16, 2005.

Michael E. Hoover (Argued), Diefenderfer Hoover Boyle & Wood, Pittsburgh, PA, for Appellant.

John J. Myers (Argued), Christine M. Gass, Eckert Seamans Cherin & Mellott, LLC, Pittsburgh, PA, for Appellees.

Before: MCKEE and CHERTOFF,\* Circuit Judges, and BUCKWALTER,

---

\* Judge Chertoff approved this opinion prior to resigning from the court, and the opinion was submitted for filing while Judge Chertoff was still a member of the court. However, this opinion is being filed after Judge Chertoff's resignation became effective.

District Judge.**

## OPINION

MCKEE, Circuit Judge:

This appeal arises from a grant of summary judgment by the district court in favor of the Defendants–Appellees in an employment discrimination action in which A. Dolores Williams sued her employers for wage discrimination and unlawful retaliation, in violation of 42 U.S.C. § 2000e ("Title VII"). Summary judgement is only appropriate if, "the pleadings, depositions, answers to interrogatories, and admissions on file, together with [any] affidavits, ... show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law," when the evidence is viewed in the light most favorable to the nonmoving party. Fed.R.Civ.P. 56(c). As this record raises genuine issues of material fact, we will reverse.

## I. BACKGROUND

Williams is a Black woman who was first employed by O'Brien and Kreitzberg, Inc. ("O'Brien") as a Project Administrator of the Light Rail Transit Project on October 15, 1997 at an hourly salary of $14.00. This is equivalent to a yearly salary of $29,120. When she was initially hired, and at all times thereafter, O'Brien maintained pay grades or levels with corresponding salary ranges for various positions. App. 83–85. Higher pay grades had commensurately higher salary ranges. For example, pay grade of eight had a minimum salary of $32,736 and a maximum salary of $53,360 while pay grade six had a minimum salary is $25,729 and a maximum salary of $41,166. App. 573.[1]

On December 26, 1997, William Lafayette, who was then Senior Vice President and Regional Manager of O'Brien's Pittsburgh Office and Mid–Atlantic Region, informed Williams that, effective January 5, 1998, her position was being changed to Manager of Administration with an annual salary of $40,000 per year. App. 393, 396-7, 585-6. That position was assigned a pay grade nine with an annual minimum salary of $37, 116. However, Williams claims that she was thereafter asked to perform the duties of a Manager of Administration and Personnel. That position had a pay grade of eleven and the minimum annual salary was therefore $48,174. Williams's belief that she was being paid for a grade nine job although she was actually given a grade eleven position was corroborated by the fact that the business cards she was issued and her subsequent performance reviews listed her as having a position that would have had a pay grade eleven rather than a pay grade nine.

On May 28, 1999, Williams sent a memo to Lafayette in which she referred to "disparity in [pay] rates," and noted the importance of "complying with EEOC." App. 621. On March 16, 2000, not having received any reply, she sent another memo to Lafayette, and Martin Wood. Wood had since been promoted to the position of Vice President and Operations Manager of the O'Brien Pittsburgh office. In that memo, she again asked that "my salary be commensurate to my title and job classifi-

---

** Honorable Ronald L. Buckwalter. United States District Judge for the Eastern District of Pennsylvania, sitting by designation.

1. Given the breadth of the salary ranges assigned to the various pay grades, and the extent to which the salary ranges overlap, it is certainly conceivable, if not inevitable, that some employees with a higher pay grade could receive a salary that is lower than some employees with a lower pay grade. However, for reasons we shall explain, this is not fatal to Williams's claim of bias at the summary judgment level.

cation as set forth by O'Brien Kreitzberg, to be retroactive to my letter to Bill [Lafayette] dated May 28, 1999." App. 632–3. She also submitted a list of male and female "non-African American" employees, and their pay grades. App. 332.

Prior to sending her March 16, 2000 memo, Williams had received positive performance evaluations. However, she alleges that following her March 16 memo, she "was subjected to various forms of harassment and retaliation in the form of false allegations of poor performance and ... management ... which ... culminated with [her] termination ... on August 29, 2000." Appellant's Br. at 14. She thereafter brought this action under Title VII alleging illegal discrimination in pay and illegal retaliation for protected activity under Title VII.

## II. DISCUSSION

Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, states in relevant part:

It shall be an unlawful employment practice for an employer ... to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin....

42 U.S.C. § 2000e–2 (2004). Under the familiar framework established by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973):

The complainant in a Title VII trial must carry the initial burden ... establishing a prima facie case of racial discrimination. This may be done by showing (I) that he belongs to a racial minority; (ii) that he applied and was qualified for a job for which the employer was seeking applicants; (iii) that, despite his qualifications, he was rejected; and (iv) that, after his rejection, the position remained open and the employer continued to seek applicants from persons of complainant's qualifications.

This analytical approach is not a rigid formula for resolving claims under Title VII because "[t]he facts necessarily will vary in Title VII cases." *Id.*, at 802, n. 13. Accordingly, our inquiry must remain flexible to properly resolve claims of discrimination in "differing factual situations." *Id.*

Thus, we have held that a Title VII plaintiff must "offer sufficient evidence that she was: (1) a member of the protected class, (2) qualified for the position she sought, and (3) nonmembers of the protected class were treated more favorably." *Goosby v. Johnson & Johnson Medical, Inc.*, 228 F.3d 313, 318–9 (3d Cir.2000) (citing *Ezold v. Wolf, Block, Schorr and Solis–Cohen*, 983 F.2d 509, 522 (3d Cir. 1993)). We have also explained that, in the context of a wage discrimination claim based upon race, a plaintiff can establish disparate treatment by producing evidence that s/he was "performing work substantially equal to that of (White employees) who were compensated at higher rate(s)" than the Black plaintiff. *Aman v. Cort Furniture Rental Corp.*, 85 F.3d 1074, 1087 (3d Cir.1996) (internal citation and quotation omitted).

### A. The Prima Facie Case for Disparate Treatment

Here, the parties dispute only the third prong of the Title VII analysis. It is not contested that Williams, as a Black woman, is a member of a protected class, and the parties do not contest her qualifications. They do disagree about whether she was paid less then she should have been paid because of racial bias.

O'Brien's pay scale assigned Williams's position of Project Administrator a pay grade of eight. The minimum salary for

that pay grade was $32,736 per year, which is significantly more than O'Brien was paying Williams. Mae Johnson, presumably an employee in personnel, brought this discrepancy to the attention of O'Brien's management. The record contains a note of a phone message from Mae Johnson to "Ted," presumably Ted Branton, the Vice President who hired Williams. The note reads in its entirety: "Dolores Williams—her $14.00/hr ($29,120) is below the minimum salary for her Grade [sic] and title. (32,736.00)." App. 583.

O'Brien responded by generating *internal, confidential* paperwork that changed Williams's title to Administrative Assistant III which had a salary grade of seven. Williams's new title placed her at the bottom of that pay range as it had a minimum salary of $29,014. Williams thereafter received a salary that would have barely been appropriate for a position at pay grade seven even though she had been hired for a grade eight position. Moreover, it does not appear that Williams ever saw the internal paperwork that changed her job from Project Administrator (grade eight) to Administrative Assistant III (grade seven).

O'Brien attempts to explain any discrepancy between her actual duties, her title, pay grade and salary by claiming that the pay grades were not used in the Pittsburgh office and that her title as Project Administrator was determined by the contract with the client. However, Lafayette was not able to point to any provision in that contract that governed Williams's salary or pay grade. Indeed, O'Brien apparently changed Williams's title without any discussion with any client once the pay grade discrepancy was disclosed to management.

When management was informed that Williams's starting salary as a Project Administrator was less than the salary as-signed to that pay grade, O'Brien did not simply ignore the pay grade schedule, as O'Brien's second, alternative explanation suggests it would have. Rather, her title was downgraded to a position with a pay grade that was consistent with her lower salary. As noted earlier, even after the downgrade, Williams's salary was still at the very bottom of the range applicable to the new title. In short, there is enough evidence here to allow a reasonable fact finder to conclude that O'Brien's explanations are nothing more than a pretext and that the discrepancies Williams complains of actually resulted from racial bias.

O'Brien's attempt to rebut Williams's suggestion that she was really at a pay grade eleven could also be rejected by a reasonable fact finder. O'Brien's contention that Williams was not really functioning at a level nine rather than eleven as she claims, is belied by the fact that O'Brien—and its successor company, URS Corporation—issued business cards to her stating that her title was "Manager of Administration and Human Resources." This position was classified at pay grade eleven. Similarly, Lafayette referred to her as "Manager of Personnel" in Williams's 1998 performance review, and "Manager of Administration and Personnel" in her 1999 review. The pay grade assigned to those positions was eleven, just as Williams claims. The record therefore supports her claim that she was improperly paid for doing a job that was assigned a pay level of nine, but apparently merited a pay level of eleven.

In addition, every other employee that O'Brien listed for the Pittsburgh office received a salary within the range established for that employee's pay grade. Moreover, several of those employees were paid near the top of the applicable pay grade. As noted above, Williams was at the very bottom of the range assigned for

her position as Project Administrator even after the title was surreptitiously changed to be consistent with O'Brien's pay grades. App. 587, 614. While Williams was paid $29,120, employees with less seniority and/or lower pay grades received higher salaries than Williams. App. 534. For example, a White female Executive Assistant—also an administrative position, but one with a pay grade of six [2]—who was hired almost one month after Williams, was given a starting salary of $39,582. *Id.*

Furthermore, the August 29, 2000 memo from "Marty" Wood to Williams notifying her of her termination explained that her position "was not a managerial position" and that Williams was therefore "expected to do the work herself and not delegate duties." App. 602. Yet, as discussed above, O'Brien's own paperwork suggests that her position was managerial.

Williams also argues that some of the difficulties she had at O'Brien stemmed from O'Brien's refusal to give her the support she needed to do her job. This may or may not be true, but we have previously noted that an employer's refusal to properly support an employee can be tantamount to setting the employee up to fail, and thus may support an inference of discriminatory animus. *See Woodson v. Scott Paper Co.,* 109 F.3d 913, 922 (3d Cir.1997). Although this record does not readily lend itself to this interpretation, it is not for us to make that factual determination; it is for a jury to decide, given the genuine factual disputes this record presents.

We have also previously stated that some forms of discrimination in the work place have taken on a new sophistication and subtlety as employers have come to profess less tolerance for bias:

[W]hile discriminatory conduct persists, violators have learned not to leave the proverbial "smoking gun" behind. As one court has recognized, defendants of even minimal sophistication will neither admit discriminatory animus or leave a paper trail demonstrating it. But regardless of the form that discrimination takes, the impermissible impact remains the same, and the law's prohibition remains unchanged. Title VII tolerates no racial discrimination, subtle or otherwise.

\* \* \* \* \* \*

Courts today must be increasingly vigilant in their efforts to ensure that prohibited discrimination is not approved under the auspices of legitimate conduct, and "a plaintiff's ability to prove discrimination indirectly, circumstantially, must not be crippled ... because of crabbed notions of relevance ...

*Aman v. Cort Furniture Rental Corp.,* 85 F.3d 1074, 1082 (3d Cir.1996) (internal citation and quotation omitted). Although we must also be vigilant to minimize the impact of groundless claims of bias on employers who have acted in good faith, summary judgment must not become a procedural expedient for resolving claims that raise a genuine issue of fact even though courts may be skeptical of the merits of the plaintiff's underlying claim.

In granting summary judgment against Williams, the Magistrate Judge relied in part on *Aman.* There, we affirmed the grant of summary judgment in favor of a defendant in a claim of wage discrimination because the plaintiffs did not refute the defendant's argument that the higher paid White employees were not similarly situated. We noted that the plaintiffs re-

---

**2.** At pay grade six, the minimum salary is $25.729 and the maximum salary is $41,166.

App. 573.

lied heavily upon a comparison of job grade levels to demonstrate preferable treatment for comparable employees from outside of the protected class. *Aman,* 85 F.3d at 1087. However, there was no evidence that the jobs or credentials of the better compensated employees were comparable to the plaintiffs' jobs and credentials. *Id.* We also accepted the defendant's explanation that "an employee's pay was not solely determined by job grade level, but by job duties and the differences in pay structure among the sales, warehouse, and administrative staff." *Id.* Summary judgment was based on this evidence, the plaintiffs' failure to refute it, and a concession by the plaintiffs that "the pay differential between individuals with the same job grade was reasonable." *Id.*

Here, Williams does not concede the reasonableness of the alleged disparity in pay grades. Instead, she argues that the disparity is driven by discriminatory animus in violation of Title VII. Meanwhile, O'Brien does not argue that Williams's salary is consistent with its pay grades. Rather, it argues that the pay grades did not apply to the Pittsburgh office. However, as we have explained, the record could support a contrary conclusion. Consequently, *Aman* does not support the district court's grant of summary judgment in favor of these employers in the present case.

## B. The Prima Facie Case for Unlawful Retaliation

In *Aman,* we stated the elements of a *prima facie* claim for illegal retaliation under Title VII as follows:

a plaintiff must show: (1) that she engaged in a protected activity; (2) that she was discharged subsequent to or contemporaneously with such activity; and (3) that a causal link exists between the protected activity and the discharge.

85 F.3d at 1085 (3d Cir.1996) (citing *Jalil v. Avdel Corp.,* 873 F.2d 701, 708 (3d Cir. 1989)). However, "we do not require a formal letter of complaint to an employer or the EEOC as the only acceptable indicia of the requisite 'protected conduct.'" *Barber v. CSX Distribution Services,* 68 F.3d 694, 702 (3d Cir.1995). The plaintiff in *Barber* did not satisfy his burden of establishing a *prima facie* case of retaliation because he could not establish that the adverse employment action was the result of his letter of complaint or protected status. We explained:

It is clear from Barber's letter that he felt that he had been treated unfairly as he stated that "the position was awarded to a less qualified individual." However, that letter does not explicitly or implicitly allege that age was the reason for the alleged unfairness. A general complaint of unfair treatment does not translate into a charge of illegal *age* discrimination.

*Id.* (emphasis in original).

As noted above, in Williams's May 28, 1999 memo complaining of disparate pay, she specifically mentioned O'Brien's need to comply with EEOC mandates. That could well have been interpreted as an explicit reference to disparate treatment based upon a protected classification under Title VII, and her supervisor may have understood that reference as such. Martin Wood, wrote in his handwritten notes following a meeting with Jennie Caruso, the Senior Regional Human Resources Manager, that "Dolores feel [*sic*] that she is being discriminated against." App. 319, 592.

Arguably, neither that reference, nor Williams's mention of the EEOC would support a claim of retaliation under Title VII if each were standing alone. However, when taken together and viewed in the light most favorable to Williams we believe

a reasonable fact finder could conclude that Williams's employer was motivated by bias in violation of Title VII. When asked at his deposition if he understood Williams's reference to EEOC "to mean Equal Employment Opportunity?" Lafayette replied: "I know what that means." App. 155. It is certainly conceivable that a jury would take O'Brien's management at its word and conclude that Williams's subsequent termination was the result of her complaints about unequal treatment in violation of Title VII. That is all that is required to survive summary judgment.

Moreover, Williams only began receiving negative performance evaluations after she sent that memo and subsequently followed up with a second memo to management on March 16, 2000.[3] She apparently continued to press her complaints to the extent that Wood acknowledged her complaints of discrimination in his notes of a May 12, 2000 meeting with Williams and supervisory personnel at O'Brien. On August 29, 2000 she was terminated.

In addition, Williams's claims of disparate treatment and retaliation must be considered along with the purging of all racial information from the Appellees' personnel files soon after Williams sent her second memorandum in the Summer of 2000. App. 481–6.[4] See Aman, 85 F.3d at 1082 ("while discriminatory conduct persists, violators have learned not to leave the proverbial 'smoking gun' behind .... [d]efendants of even minimal sophistication

will neither admit discriminatory animus or leave a paper trail demonstrating it." (internal quotation and citation omitted)). It is for a jury, not a court to determine what, if any, significance to attach to that.

The Magistrate Judge realized the potential significance of this evidence in denying the employers' motion for summary judgment on Williams's retaliation claim. The Magistrate Judge wrote: "Based on the plaintiff's good faith complaints of disparate pay—which the defendants understood as meaning she felt discriminated against—it appears that the plaintiff engaged in a protected activity." App. 20. We agree. As the Magistrate Judge explained:

The plaintiff avers that almost immediately after she sent her memo of March 16, 2000, her relationship with her supervisors began to deteriorate, a pattern of antagonism toward her developed, and her employment was terminated on or about August 27, 2000. Since this adverse employment action occurred in close temporal proximity to the plaintiff's complaints of disparate pay, a causal connection exists between the protected activity and the adverse action.

Id.

It should be noted, however, that temporal proximity is neither necessary nor sufficient to establish causation. See Aman, supra, and Kachmar v. SunGard Data Systems, Inc., 109 F.3d 173, 178 (3d Cir.

---

3. Though Williams points to the March 16, 2000 memo as the source of the alleged retaliation, it is arguable that this memo, standing alone, would not suffice as the basis of a retaliation claim. Yet in light of the totality of the evidence, a reasonable jury could still conclude that the employer's adverse evaluations and subsequent adverse employment actions were the result of Williams' references to the EEOC. Such a finding could constitute the causal link required to sustain a claim of illegal retaliation under Title VII.

4. The evidence also reveals that Williams sent Wood an email in which she stated that she was "being singled out" and that she found this to be "harassing." App. 639. Wood's email message in response acknowledged her complaint of harassment and referenced the upcoming May 12 meeting, in which he noted that Williams felt discriminated against. Id., at 637.

1997). Nevertheless, the timing of Williams's dismissal is a part of the totality of circumstances that a reasonable juror could consider in finding the required nexus between her complaints and her termination. *See Woodson, supra.*

## III. Conclusion

We find that this record presents significant questions of fact that require further discovery and merit review by a jury. While we offer no opinion or prediction regarding the likelihood of the Appellant's success on the merits of her case, we do believe that the evidence is sufficient to survive her employers' motion for summary judgment. For the foregoing reasons, we will reverse.