OPINION
BARRY, Circuit Judge.
Plaintiff Tyra Coleman, along with others, brought this action in the U.S. District Court for the Eastern District of Pennsylvania against her employer, Blockbuster, Inc. (“Blockbuster”), alleging discriminatory training and termination of her employment in violation of Title VII of the Civil Rights Act of 1964 (“Title VII”) and 42 U.S.C. § 1981. The District Court, after concluding that Coleman was unable to establish a prima facie case of discrimination, granted Blockbuster’s motion for summary judgment, and Coleman appealed.[1] We will affirm.
I. BACKGROUND
On September 8, 2003, Tyra Coleman was hired as a Blockbuster store manager trainee by district manager Cari-Ann Urbanek. She was promoted to store manager at the Grays Ferry, Philadelphia Blockbuster store a few months later. After a series of disciplinary infractions during her nine months with Blockbuster, her employment was terminated on June 22, 2004.
A. Blockbuster’s Progressive Discipline Policy
Blockbuster’s disciplinary policies aim to provide consistency when dealing with employee performance issues and, at the same time, retain enough flexibility to take *678 “into consideration the nature of the policy-violation as well as previous disciplinary actions for each individual.” (App. at 331.) Blockbuster’s Employee Handbook makes clear that where there has been a performance violation, “the seriousness and history of [that] violation must be taken into account.” (Id.) Corrective action usually progresses as follows: verbal warning, written warning, final warning, and ultimately, termination. The Handbook is explicit that an employee’s status is “at-will” and that disciplinary measures may be accelerated.
Violations prompting corrective action are broadly classified into three categories, and while the “list of violations is not meant to be all-inclusive,” it is instructive. (Id.) Moreover, any corrective action ultimately “will depend on the exact nature of the offense.” (Id. at 332.) Class A violations, or gross violations, are “very serious and may be grounds for immediate termination.” (Id.) Examples of Class A violations include borrowing money from the cash drawer, disregarding Blockbuster’s policies, engaging in harassing behavior, and making racial slurs. “[G]ross negligence that endangers people or property” is also a violation, and employees are prohibited from “[allowing any non-Blockbuster personnel ... into the store or other Blockbuster facility outside of normal business hours or into unauthorized areas during normal business hours.” (Id. at 335.) Class B violations, or major violations, include negligent conduct that could endanger others and that puts “Blockbuster in a position of possible legal liability.” (Id.) “Opening store late and/or closing store early without District Leader’s permission” is also punishable as a Class B offense. (Id. at 336.) When an employee commits his or her first Class B offense, “the employee may receive a final written warning and be advised that a recurrence may be grounds for termination.” (Id.) Blockbuster’s Standard Operating Procedures (“Operating Procedures”) also make clear that if an “employee is already on Progressive Discipline at the time another violation is committed, he or she may be subject to more stringent penalties even though the later violation is a different type from the earlier one.”[2] (Id. at 345.) Finally, Class C violations, or minor violations, include excessive absenteeism, violation of company dress code standards, and “unsatisfactory job performance.” (Id. at 336.) At the first commission of a Class C violation, the employee “may be given a verbal warning ..., [and on] further occurrences, one or more written warnings may be conducted before termination.” (Id.)
B. Coleman’s Employment at Blockbuster
On January 14, 2004, Coleman was assigned to be the store manager at Blockbuster’s Grays Ferry location. Stores are inspected to ensure that they are up to the appropriate level of operational and merchandising standards. When making this assessment, evaluators use the “Model Store Checklist,” and all stores must score an eight or greater. (Id. at 386.) After an evaluation of Coleman’s store on March 2, 2004, the store was given a score of 4.3. Coleman was given a supplemental checklist to improve her store’s condition, and she represented at a meeting on March 9 that she would have her store up to the appropriate standard by April 2. On April 9, however, the store was again evaluated and given a score of 5. Coleman received written corrective action, which cited her “[fjailure to meet performance standard-Store Standards.” (Id.) Coleman and Ur *679 banek signed the Corrective Action Record on April 20, 2004.
Coleman received a second Corrective Action Report that same day, this time for her failure to conduct cycle counts on a daily basis; indeed, there had been no cycle counts for nine days.[3] Despite signing the Corrective Action Report, Coleman maintained that the failure to perform cycle counts is not listed as a Class A, B, or C offense, and that she was not responsible for carrying out the cycle counts. The Corrective Action Report notes that as store manager, “it is Tyra’s responsibility to ensure that all other employees are also performing their cycle counts.” (Id. at 387.) This discipline was considered a “final warning.” (Id.)
A third Corrective Action Report was issued to Coleman on June 11, 2004. This Report resulted from two alleged infractions: first, Coleman missed a mandatory team meeting on June 7, 2004, and second, Coleman brought her two year-old grandson to work with her. Coleman was instructed to attend all mandatory meetings and reminded not to bring non-employees into the workplace either before or after the store’s scheduled business hours. The consequences portion of the document reads: “Failure to improve will result in termination of employment.” (Id. at 388.) This document notes Coleman’s two prior offenses, is signed by both Coleman and Urbanek, and is marked “final warning.”
Coleman’s termination resulted from an episode that occurred on June 15, 2004. The exact details of what transpired that day are in dispute, but the basic narrative is not. At some point during her shift, Coleman learned that her minor son was having a medical emergency and, having no one else to be with him, she called Urbanek to request permission to close the store early and leave work. Urbanek’s exact response is unclear, but Coleman’s understanding is that she said, “I’m not telling you not to attend to your son, and I’m not telling you not to close the store.” (Id. at 764.) Coleman then claims that Urbanek called her back and reminded her to make certain that the register was properly secured. Whatever this exchange meant, it left Coleman with the impression that she was free to do what she needed to do. On June 22, 2004, Coleman’s employment at Blockbuster was terminated as a result of her closing the store early on June 15. The Employee Separation Form noted Coleman’s disciplinary history: a written warning on April 20 for “store appearance,” a final written warning on April 20 for “failure to protect comp, assets-cycle counts,” and another final written warning on June 11 for “attendance and non-employee in store.” (Id. at 384.)
II. STANDARD OF REVIEW
We exercise plenary review of the District Court’s order granting summary judgment and apply the same standard the Court was required to apply: whether there are any genuine issues of material fact sufficient to permit a reasonable jury to find in favor of the plaintiff. Doe v. C.A.R.S. Prot. Plus, Inc., 527 F.3d 358, 362 (3d Cir.2008). In conducting our review, we must view “the facts and any reasonable inferences drawn therefrom in the light most favorable to the party opposing the motion.” In re Flat Glass Antitrust Litig., 385 F.3d 350, 357 (3d Cir.2004) (quoting InterVest, Inc. v. Bloomberg, L.P., 340 F.3d 144, 160 (3d Cir.2003)). We have jurisdiction under 28 U.S.C. § 1291.
*680 III. DISCUSSION
Employment discrimination claims under Title VII and § 1981 are analyzed pursuant to the burden-shifting framework articulated in McDonnell Douglas Corp. v. Green., 411 U.S. 792, 802, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973); see also Schurr v. Resorts Int’l Hotel, Inc., 196 F.3d 486, 499 (3d Cir.1999) (“[T]he elements of employment discrimination under Title VII are identical to the elements of a section 1981 claim.”) (internal citations omitted). Accordingly, Coleman bore the initial burden of setting out a prima facie case of discrimination by a preponderance of the evidence. See St. Mary’s Honor Ctr. v. Hicks, 509 U.S. 502, 506, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993). The burden then shifts to the employer to “articulate some legitimate, nondiscriminatory reason for the employee’s [termination].” McDonnell Douglas, 411 U.S. at 802, 93 S.Ct. 1817. Finally, the plaintiff must then prove by a preponderance of the evidence “that the employer’s proffered reasons were merely a pretext for discrimination, and not the real motivation for the unfavorable job action.” Sarullo v. U.S. Postal Serv., 352 F.3d 789, 797 (3d Cir.2003); see Hicks, 509 U.S. at 507-08, 113 S.Ct. 2742.
There is no dispute as to the first three elements of Coleman’s prima facie case: (a) she is African-American, (b) she was qualified for the position that she held, and (c) she suffered an adverse employment action when she was terminated by Blockbuster. At the fourth prong, however, the District Court determined that Coleman failed to offer “evidence that she was terminated under circumstances that give rise to an inference of unlawful termination.” (App. at 29.) Thus, the Court granted summary judgment on Coleman’s Title VTI and § 1981 claims.
On appeal, Coleman argues that the District Court applied too harsh a standard when assessing this final prong of the prima facie case. We disagree. The Court recognized that the aim of the prima facie test is to discern “whether the employer is treating ‘some people less favorably than others because of their race, color, religion, sex, or national origin.’ ” Pivirotto v. Innovative Sys., Inc., 191 F.3d 344, 352 (3d Cir.1999) (quoting Int’l Bhd. of Teamsters v. United States, 431 U.S. 324, 335 n. 15, 97 S.Ct. 1843, 52 L.Ed.2d 396 (1977)). It proceeded to look for just that, but did not find that Coleman’s case gave rise to an inference of discrimination.
Even assuming arguendo that Coleman established a prima facie case, her claim must nonetheless fail because she is unable to demonstrate that Blockbuster’s proffered legitimate, nondiscriminatory reason for termination “was merely a pretext for unlawful discrimination.” Goosby v. Johnson & Johnson Med., Inc., 228 F.3d 313, 319 (3d Cir.2000). Demonstrating pretext is a “difficult burden.” Fuentes v. Perskie, 32 F.3d 759, 765 (3d Cir.1994). Doing so requires that the plaintiff “point to some evidence, direct or circumstantial, from which a factfinder could reasonably either (1) disbelieve the employer’s articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer’s action.” Fuentes, 32 F.3d at 764; see Hampton v. Tinton Falls Police Dep’t, 98 F.3d 107, 113 (3d Cir.1996). Making a judgment about whether pretext exists is “a fact-based inquiry,” Kautz v. Met-Pro Corp., 412 F.3d 463, 468 (3d Cir.2005), and so the plaintiff “must demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer’s proffered legitimate reasons for its action that a reasonable factfinder could rationally find them *681 unworthy of credence,” Fuentes, 32 F.3d at 765 (internal citations omitted).
Blockbuster came forward with solid evidence to demonstrate that the reason for Coleman’s termination was her dereliction of duty. In accordance with its progressive discipline policy, Coleman’s earlier performance deficiencies did not result in immediate termination. She was first given a written warning for failing to keep the store up to standards, and then issued a final warning for not making certain that routine cycle checks were performed. When she missed a meeting and brought a young child into the store against policy, she was not terminated but, rather, was issued a second written warning. By the time Coleman closed the store early on June 15, she had a record of disciplinary problems, and had been issued two final warnings. Thus, the corrective action followed the progression articulated in the Handbook.
Coleman disputes many of the facts related to the earlier disciplines. For example, she argues that the cycle counts were not her responsibility and that she informed Urbanek that she would miss the June 7 training session but make it up at a later date. Nonetheless, Coleman signed each of these reports at the time they were issued. She also argues that certain of her actions that resulted in some form of discipline were not explicitly listed as Class A, B, or C violations; however, the Handbook is clear at the outset that the “list of violations is not meant to be all-inclusive.” (App. at 331.) As to the June 15 store closure that resulted in her termination, whether Coleman legitimately thought that she had permission to close is not material because there is no evidence even suggesting that her termination was motivated by race. In any event, Coleman argues, “you have to commit the same action over and over again before you’re terminated.” (Id. at 360.) This argument is directly at odds with Blockbuster’s Operating Procedures, which make clear that an employee who has already been disciplined “at the time another violation is committed ... may be subject to more stringent penalties even though the later violation is a different type from the earlier one.” (Id. at 345 (emphasis added).)
Coleman also cites what she describes as “evidence” in her effort to establish pretext. She refers, without any substantiation, to a Caucasian employee in her store who “got away with murder” and was not terminated. (Id. at 360.) She points to yet another employee, Greg Zielinski, who was not terminated, but instead, given a final warning when he closed his store too early. Coleman incorrectly describes him as “similarly situated,” but as Zielinski’s Corrective Action Record indicates, he had no prior disciplinary infractions at the time he was disciplined. Coleman marshals other “contextual evidence of discrimination,” but that “evidence” is page after page of anecdotes overheard and unsubstantiated allegations, all of it having little or nothing to do with her termination or with discrimination.
IV. CONCLUSION
Coleman has not shown “weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions” in Blockbuster’s reasons for terminating her such that a factfinder could “rationally find them unworthy of credence.” See Fuentes, 32 F.3d at 765; see also Jones v. Sch. Dist. of Phila., 198 F.3d 403, 413 (3d Cir.1999). The order of the District Court will be affirmed.

. Some of die other plaintiffs filed notices of appeal, but Coleman is the only one who has pressed an appeal.

. Coleman was aware of the Operating Procedures. (App. at 764.)

. Cycle counts are mandatory tasks used to track a store's inventory. They require an employee to "do blind counts on the required product, and then status the item to check for variances” in inventory. (App. at 387.)